104 N.J. Super. 550 (1969)
250 A.2d 756
JOSEPHINE DiGIOVANNI, PLAINTIFF-APPELLANT AND CROSS-RESPONDENT,
v.
DR. J.F. PESSEL, a/k/a JOHANNES PESSEL, AND DR. JOSEPH C. BORRUS, DEFENDANTS-RESPONDENTS AND CROSS-APPELLANTS, AND CARRIER CLINIC, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued September 30, 1968.
Decided February 26, 1969.
*554 Before Judges GOLDMANN, KOLOVSKY and CARTON.
Mr. Charles E. Stein argued the cause for Josephine Di Giovanni.
Mr. Robert M. Graham argued the cause for Dr. J.F. Pessel (Messrs. Champi and Graham, attorneys; Mr. Frank Yurasko, on the brief).
Mr. Raymond M. Tierney, Jr. argued the cause for Dr. Joseph C. Borrus (Messrs. Shanley & Fisher, attorneys; Mr. John F. Lynch, Jr., on the brief).
Mr. Charles W. Hutchinson argued the cause for Carrier Clinic (Messrs. Lamb, Blake, Hutchinson & Dunne, attorneys; Mr. John I. Lisowski, of counsel).
KOLOVSKY, J.A.D.
All members of the court agree that the judgment of dismissal in favor of Carrier Clinic should be affirmed and that the judgment in plaintiff's favor against Dr. Borrus should be reversed. However, I would also reverse the judgment recovered by plaintiff against Dr. Pessel while my confreres are of the view that that judgment should be reduced from $5,500 to $5,000 but otherwise affirmed. I embody herein my reasons for agreeing with the unanimous decisions reached as to Carrier Clinic and Dr. Borrus and my reasons for dissenting from the majority's ruling with respect to the judgment against Dr. Pessel.
Pursuant to an order of temporary commitment (see N.J.S.A. 30:4-37) dated August 17, 1965 entered by the municipal magistrate of Franklin Township, plaintiff Josephine Di Giovanni, then 73 years of age, was committed on August 18, 1965 to the mental hospital operated by defendant Carrier Clinic (Carrier). The order was entered *555 on the verified application of plaintiff's husband Frank, to which were attached certificates of insanity executed, purportedly under oath, by defendants Dr. Pessel and Dr. Borrus. Plaintiff remained at the hospital until September 16, 1965, having on September 8 executed a "voluntary application" for treatment.
In this action for damages against Carrier and the two doctors, plaintiff charged each of them with negligence and false imprisonment. The case was tried to a jury.
At the close of all the evidence, the trial judge (1) granted Carrier's motion for judgment; (2) dismissed the negligence (malpractice) claims asserted against the two doctors, and (3) ruled that the proofs established as a matter of law (a) that "the conduct of the doctors * * * constituted false imprisonment" because "plaintiff was in fact placed in the Carrier Clinic by virtue of a procedure that was defective"; (b) that plaintiff "was of unsound mind and * * * needed psychiatric help", so that she was not entitled to compensatory damages, and (c) that the jury was to be asked to decide but one question, the amount of punitive damages to be awarded plaintiff.
The conduct of Dr. Borrus which the trial court referred to in its ruling that Borrus had committed the tort of false imprisonment was that he had signed the affidavit at the foot of his certificate in the absence of a notary, verifying his signature the next day in a telephone conversation with the notary public who had then completed the jurat.[1]
Dr. Pessel, too, did not sign the affidavit of his certificate of insanity in the presence of a notary. According to the doctor, the notary who thereafter completed the jurat on his affidavit was an employee of a hospital who was familiar *556 with his signature. In addition, and more significant, was the fact that although Dr. Pessel's certificate stated that he had made a personal examination of plaintiff at New Brunswick on August 13, 1965, the truth was that he had last seen her on March 27, 1965.
The jury's verdict as first announced by the foreman was
"We have a judgment against Dr. Borrus, $500, eleven and one vote.
We have a judgment against Dr. Pessel $500 and $5,000, or $5,500.00."
Extensive colloquy then followed between counsel and the court as to the purport of the jury's verdict with respect to Dr. Pessel, during the course of which the jury was asked to retire. Questioning of the jury after it was called back established that the verdicts all represented punitive damages, that the jury "equate[d] the acts of the doctors with respect to the oath as punishable by * * * $500," and that the jury's verdict against Dr. Pessel "was intended to be one verdict against Dr. Pessel in the amount of $5,500.00, $500 by reason of the failure with respect to the oath and $5,000 with respect to the non-examination."
The matter is before us on separate appeals filed by plaintiff and by defendants Pessel and Borrus.
The record reveals no genuine dispute as to the essential and controlling facts.
That plaintiff was in dire need of the hospitalization and treatment which she received and that the treatment benefited her stands uncontradicted. Plaintiff called no medical witnesses other than the two defendant doctors and Dr. Shoemaker of Carrier Clinic. Nor was there any contradictory testimony by lay witnesses. Plaintiff's attorney acknowledged at oral argument that he had been retained by both plaintiff and her husband to prosecute this action, yet he chose not to call the husband or any of the plaintiff's seven children as witnesses. Two of plaintiff's daughter's did testify, under subpoenae by defendants. Their moving description of their mother's unfortunate condition and conduct *557 prior to her commitment confirms the judgment of the certifying physicians that plaintiff's condition was "such that [s]he should be placed under immediate restraint in an institution," N.J.S.A. 30:4-37. Nothing in plaintiff's own brief testimony is to the contrary.
When the application for commitment was submitted to the municipal magistrate by the husband's attorney, Harold Sklarew, it and the attached certificates were complete and in proper form.
The appointment for plaintiff's examination by Dr. Borrus, an experienced psychiatrist and a diplomate of the American Board of Neurology and Psychiatry, had been made by Ann Di Giovanni, plaintiff's eldest daughter. Miss Di Giovanni testified that it was Mr. Sklarew, her father's attorney, "who recommended Dr. Borrus to examine [her] mother for commitment purposes." Dr. Borrus examined plaintiff on August 15, 1965 and completed and signed his certificate on the same day.
Dr. Pessel is an internist with offices in Trenton. He saw plaintiff for the first time on May 29, 1964. After examining her, he made suggestions for the easing of her various complaints, both physical and mental. Among the 13 suggestions listed in Dr. Pessel's letter of June 29, 1964 to the doctor who had referred plaintiff to him were:
"10. More vacations away from the tension and anxiety of her home.
* * * * * * * *
12. Brandy or wine on retiring to be used as a `sleeping potion.'"
Plaintiff then visited Dr. Pessel three times in June 1964, once in each of the months of August, September, October, November and December 1964, and January, February and March 1965. The last time that Dr. Pessel saw plaintiff was on March 27, 1965.
There is no contradiction of the doctor's testimony that during those visits he learned from members of her family, and in part from plaintiff herself of her worsening nervous *558 condition, including, among other things, her inability to sleep, her accusations of infidelity against her ailing 75-year-old husband, her violent behavior and threats of suicide. Tranquilizers were prescribed but, as reported to the doctor by plaintiff's family, her behavior became even worse after March 1965. Some time in July 1965 the doctor suggested that plaintiff be hospitalized in a state hospital to receive the psychiatric help which she needed "very badly." The family decided that they preferred to have the commitment to a private hospital. According to the doctor, he yielded to the importunities of plaintiff's daughter and signed the certificate on August 13, 1965 because of the difficulty the family was having in arranging for plaintiff's examination by local psychiatrists, but did so on condition that a psychiatrist confirm his diagnosis.
The order of temporary commitment, complaint and certificates were filed with Carrier at the time of plaintiff's admission. By letter of August 19, 1965, Carrier forwarded certified copies thereof to the county adjuster of Somerset County with the request that he "process the enclosed temporary order through to the Court for final commitment." The order of August 17 had designated September 2, 1965 as the date for final hearing, but by letter of September 3, 1965 the county adjuster forwarded to Carrier's medical director a notice of final hearing to be held on September 10, 1965, with a request that it be served on plaintiff. (Similar notices were enclosed for service on other patients.)
On September 8, 1965 plaintiff was persuaded by her husband and daughter to sign a "voluntary application." By letter of that date, Carrier notified the county adjuster that it therefore would "not be necessary to process the order through for final commitment." The application for commitment was thereafter dismissed by order of the Somerset County Court dated October 8, 1965 after reciting, inter alia, the original application, the designation of September 10, 1965 as the date for final hearing, and plaintiff's removal from commitment status at Carrier on September 8, 1965.
*559 Plaintiff was discharged from Carrier Clinic on September 15, 1965.[2]
With this factual background, I now consider the propriety of the several rulings of the trial court involved in the respective appeals.

A. The dismissal of the malpractice and false imprisonment claims against Carrier Clinic.

On appeal, plaintiff does not challenge the dismissal of the malpractice claim against Carrier. The dismissal was proper. There was no proof of negligence, nothing to show that Carrier deviated from accepted and recognized standards in its hospitalization and treatment of plaintiff.
Plaintiff concedes, with respect to the false imprisonment count against Carrier, that the municipal magistrate's order of August 17, 1965 authorized her confinement for the 20 days beginning with August 18. She argues however that the 20 days expired at 12:01 A.M. on September 7, 1965, so that her confinement from that time until at least the time when the voluntary commitment form was signed on September 8, 1965 was without legal warrant. Further, she contends that her execution of the voluntary commitment form on September 8, 1965 did not justify her continued *560 confinement because her action in signing it was not voluntary and she was induced to sign it by a misrepresentation that she could sign herself out on 72 hours' notice.
We agree with the trial court that both contentions lack merit. The evidence furnishes no support for plaintiff's attempt to repudiate the voluntary commitment signed by her on September 8, 1965. Nor is there any validity to plaintiff's charge that her confinement for the one-day period from September 7 to September 8 was without legal warrant.
While N.J.S.A. 30:4-37 provides that the order of temporary commitment shall authorize the detention of the patient for 20 days, that period may be extended if there is a continuance of the date for final hearing. See N.J.S.A. 30:4-42 which provides:
"A continuance of the final hearing, when endorsed on the complaint, or certified copy thereof, shall be sufficient warrant and authority for the detention of the patient for such period. The aggregate period of continuances shall not exceed three months from the date originally fixed for final hearing. The county adjuster in all class "B" and class "C" cases shall forthwith notify the chief executive officer of the institution in which the patient is confined, of a continuance."
*561 Plaintiff concedes that the authorized period of a patient's detention is extended by a continuance of the date of the final hearing but argues that it has not been shown that the continuance beyond September 2, 1965, the date of final hearing recited in the magistrate's order of August 17, 1965, was "endorsed on the complaint or certified copy thereof" as required by N.J.S.A. 30:4-42.
We perceive no reason to disturb the trial court's findings, which are supported by the proofs, that the records of the Somerset County Adjuster and of the Somerset County Court established not only that the date of final hearing had been duly continued until September 10, 1965 but also that other requirements of N.J.S.A. 30:4-42 had been complied with so as to authorize plaintiff's detention under the original order until the continued date of final hearing.
Here, as directed by N.J.S.A. 30:4-37, the original order for plaintiff's temporary commitment, the application and the certificates were filed with Carrier's medical director, who sent a certified copy thereof to the county adjuster. The county adjuster, whose duty it is "to present forthwith such certified copies to the court of [his] county," N.J.S.A. 30:4-37, and to cause to be served "written notice of the time and place of final hearing," N.J.S.A. 30:4-41, prepared and sent to Carrier, for service on plaintiff, the notice reciting that the final hearing was to be held on September 10, 1965. It is undisputed that the continuance in the date of final hearing was made necessary because the County Court was not in session on September 2, 1965, the date originally set for final hearing by the magistrate's order.
Carrier's motion for judgment on both counts was properly granted.

B. The dismissal of the malpractice claims against Dr. Borrus and Dr. Pessel.

The relationship between a physician and the person whom he examines and certifies as insane in support of an *562 ex parte application for an order of commitment may not have all the attributes of the usual physician-patient relationship. Nevertheless, I am satisfied that the physician owes the person he is so examining the duty of reasonable care. Miller v. West, 165 Md. 245, 167 A. 696, 697 (Ct. App. 1933); Annotation, "Malpractice  mental disease," 99 A.L.R.2d 599, 617 (1965); 70 C.J.S. Physicians and Surgeons § 49, p. 972; cf. Beadling v. Sirotta, 41 N.J. 555, 561 (1964), holding that a duty of reasonable care is owed by a physician to a person whom he examines at the request of the latter's employer.
I agree with the Maryland court that such "physicians, although they are not employed by the patient, and make no report to him, are under a legal duty to him which will support an action, if the duty is violated, and if as a consequence a person who should not be confined is confined." Miller v. West, supra, at 167 A., at pp. 697-698.
However, as the Maryland court also noted:
"But the action, if it lies, can be resorted to only for redress of injury from the physicians' having contributed to bring about confinement of one who should not have been confined. If the patient was in fact insane, and in need of the confinement, there would be no actionable injury from wrongful procedure in confining him." (167A., at p. 698).
Here, the basis for the court's dismissal of the malpractice counts was its ruling that there was no proof of a standard of medical practice to which defendant doctors allegedly failed to adhere. See Sanzari v. Rosenfeld, 34 N.J. 128, 135 (1961).
Plaintiff argues that the record contains such proof even though she called no medical experts of her own. There is no substance to the claim as far as Dr. Borrus is concerned.
However, the proofs did establish a deviation by Dr. Pessel from a controlling standard of practice or conduct. N.J.S.A. 30:4-30 mandates that a physician who certifies as to a person's insanity for the purpose of commitment do so only on the basis of a personal examination *563 within ten days of the commitment. The statute sets the standard of conduct to be observed, as Dr. Pessel himself recognized by falsely certifying that he had in fact examined plaintiff within the required period. Proof of Dr. Pessel's deviation from the statutory standard of conduct constituted proof of his negligence. Evers v. Davis, 86 N.J.L. 196, 204 (E & A. 1914).
Nevertheless, the dismissal of the malpractice claim against Dr. Pessel was proper. There was no proof of injury, the evidence being uncontradicted that plaintiff was in need of the hospitalization and treatment she received. Miller v. West, supra; cf. Ochs v. Public Service Railway Co., 81 N.J.L. 661, 662 (E. & A. 1911); Rosenau v. City of New Brunswick, 51 N.J. 130, 137 (1968).

C. The ruling that the proofs established as a matter of law a cause of action for false imprisonment against defendant doctors.

Two deficiencies are relied upon by plaintiff in support of her claim that the proceedings before the magistrate were void ab initio, so that his order of commitment is not a bar to the prosecution of the action for false imprisonment.
The first  applicable to both Dr. Borrus and Dr. Pessel  is that the doctors' affidavits were signed in the absence of a notary. In my view, that deficiency did not have the effect for which plaintiff contends and does not afford any basis for recovery against either of the doctors.
Plaintiff's confinement in Carrier Clinic was pursuant to an order of the magistrate of the municipal court of Franklin Township, a court of competent jurisdiction (see N.J.S.A. 30:4-37). That court did not lose or lack jurisdiction, nor was its order of commitment rendered void because the affidavits verifying the doctors' certificates, which when presented to the magistrate were regular on their face, had in fact been signed by the affiants in the absence of a notary, with the jurats being completed later. State v. Bigley Bros., Inc., 53 N.J. Super. 264, 268-269 (App. Div. 1958). Plaintiff's reliance on State v. Mershon, 39 N.J. *564 Super. 599, 603 (Cty. Ct. 1956), in support of her contention that the order of commitment was void ab initio because of the defective notarizations of the doctors' affidavits is misplaced. Mershon has been expressly disapproved by this court. State v. Bigley Bros., Inc., supra, 53 N.J. Super., at p. 268.
The second deficiency  applicable only to Dr. Pessel  is the false statement in his certification that he had examined plaintiff on August 13, 1965.
My brethren are of the opinion that plaintiff established a cause of action for false imprisonment against Pessel by showing the falsity of his statement that he had examined her on August 13, 1965 when in truth he had last seen her on March 27, 1965. They deem irrelevant the fact that plaintiff's commitment and detention were pursuant to the magistrate's order of August 17, 1965.
I do not agree that the proofs established a cause of action for false imprisonment against Dr. Pessel. In my view, the majority's decision disregards the essential difference between an action for malicious prosecution and one for false imprisonment, two separate and distinct torts. Earl v. Winne, 14 N.J. 119, 128 (1953); Genito v. Rabinowitz, 93 N.J. Super. 225, 228 (App. Div. 1966); Prosser on Torts (3d ed. 1964), § 12, p. 62. To conclude as the majority does is to reject the settled rule that an arrest, detention or commitment, pursuant to a warrant or order regular on its face and issued by a court of competent jurisdiction, is legal authority for such detention and does not give the person detained a cause of action for false imprisonment either against the person who detained him or against the person executing the affidavit on the basis of which the warrant or order issued, and this even if the affidavit was false and the person executing it acted maliciously. Genito v. Rabinowitz, supra; Apgar v. Woolston, 43 N.J.L. 57, 58 (Sup. Ct. 1881); 32 Am. Jur.2d, False Imprisonment, § 66, p. 127; Prosser on Torts (3d ed 1964), § 12, p. 62; § 113, p. 853; see also Annotation, 145 A.L.R. 728 et seq.; cf. Mezullo v. Maletz, *565 331 Mass. 233, 118 N.E.2d 356, 359 (Sup. Jud. Ct. 1954).
Prosser on Torts, supra, at p. 62, points out that:
"The distinction between * * * [false imprisonment and malicious prosecution] lies in the existence of valid legal authority for the restraint imposed. If the defendant complies with the formal requirements of the law, as by swearing out a valid warrant, so that the arrest of the plaintiff is legally authorized, the court and its officers are not his agents to make the arrest, and their acts are those of the law and the state, and not to be imputed to him. He is therefore liable, if at all, only for a misuse of legal process to effect a valid arrest for an improper purpose. The action must be for malicious prosecution, upon proof of malice and want of probable cause, as well as termination of the proceeding in favor of the plaintiff."
And so in Genito v. Rabinowitz, supra, this court recently ruled:
"The malicious filing of a false complaint which causes the issuance of a warrant upon which one is arrested does not give rise to a cause of action for false imprisonment. The action must be one for malicious prosecution." (93 N.J. Super., at p. 228).
Here, the magistrate had legal authority to issue the order of commitment and the order was regular and legal in form. It therefore was "legal justification" for plaintiff's commitment and detention in the Carrier Clinic, so that plaintiff may not maintain an action for false imprisonment because of the commitment and detention pursuant thereto. See also, 32 Am. Jur.2d, False Imprisonment, § 66, p. 127.
Nor is the validity of that "legal justification" affected by the fact that the order was issued by the magistrate in reliance on Dr. Pessel's affidavit which falsely stated that he had examined plaintiff within ten days of the application for the order. That falsehood is relevant to the malpractice claim and it would be relevant if this were an action for malicious prosecution. It does not however render void the order issued on the basis of the affidavit.
As was said many years ago in Apgar v. Woolston, supra:
*566 "If the court had jurisdiction, and the process was regular, trespass [for false imprisonment] will not lie, however malicious the conduct of the defendant may have been in setting the prosecution on foot; and the only sustainable action, under such circumstances, is case for the malicious motive and want of probable cause in promoting the prosecution." (43 N.J.L., at p. 58)
Judge Carton also finds a basis for holding Dr. Pessel liable for false imprisonment because in his opinion,
"The proofs fall far short of demonstrating that plaintiff's condition was such, as a matter of law, as to require restraint for her own protection or the safety of others  especially where, as here, there was no hearing before the commitment. It is beside the point that plaintiff may have needed certain treatment and may have benefited from the particular treatment she received and which was administered without her consent. Such circumstances may be relevant to the issue of compensatory damages, but the fundamental inquiry remains whether the treatment she received required, of necessity, confinement and involuntary restraint."
If Judge Carton is correct in his analysis, then there was, in my view, no reason to deny plaintiff compensatory damages for the alleged false imprisonment and no justification for dismissing her malpractice claims against either Pessel, Borrus or Carrier. For then there would be at least a jury issue as to whether all three defendants were not negligent in confining a person whose confinement was not called for. Further, if confinement was not necessary, then plaintiff suffered injury by reason of the negligence of all three defendants.
However, as I have indicated, even if Judge Carton's evaluation of the proofs were correct, they would not give rise to a cause of action for false imprisonment.
Moreover, in my opinion, the record in no wise supports Judge Carton's evaluation of the proofs. No one testified that plaintiff was not in need of the hospital confinement and treatment which she received. All the evidence in the case is to the contrary. That plaintiff's condition was such that she required immediate restraint in an institution for appropriate treatment was not only the opinion expressed in the certificates of defendant doctors, it was the opinion *567 expressed by every physician who examined her either immediately prior to or immediately after she entered the Carrier Clinic. That was the opinion of Dr. Borrus, the certifying psychiatrist, of Dr. Shoemaker of Carrier Clinic who testified at the trial, and of Dr. Wood who also examined her at Carrier and whose report is in evidence. Also in evidence is the fact that the staff psychiatrist committee of Carrier, after reviewing the reports of Drs. Shoemaker and Wood, concurred in their opinions.
The uncontradicted opinions of the psychiatrists are supported by the uncontradicted testimony of the lay witnesses in the case. Plaintiff's two daughters vividly described the fears of the family for plaintiff's safety as well as plaintiff's erratic and uncontrolled behavior. That behavior included hitting her head against the wall, ranting and raving, sitting in the corner and staring into space, screaming, tearing and pulling her hair and sometimes that of the daughters, and her violent tantrums. They told, too, of the several occasions during the early morning hours when they were called by their father to come to the parents' home to attempt to calm their mother. The testimony of the daughters was not challenged by anyone; not even by the husband who, plaintiff's attorney tells us, joined in retaining him to prosecute the present action.
While a person suffering injury by reason of his commitment to a mental institution pursuant to a court order entered on the basis of a physician's affidavit which contains false statements may not prosecute an action for false imprisonment, he is not without a remedy to recover damages that he may have sustained. As noted above, he may maintain an action against the doctor for malpractice. Further, if the physician acted maliciously and without probable cause, he as well as the prosecutor of the proceedings with whom he conspired is subject to a suit for malicious prosecution. Annotation, "Malicious prosecution  lunacy proceeding," 145 A.L.R. 711, 712 (1943); Hough v. Ogden, 4 N.J. Misc. 455, 133 A. 73 (Sup. Ct. 1926); Sheean v. Holman, 6 *568 N.J. Misc. 346, 141 A. 170 (Sup. Ct. 1928); but cf. Mezullo v. Maletz, 331 Mass. 233, 118 N.E.2d 356, 358 (Sup. Jud. Ct. 1954); Bailey v. McGill, 247 N.C. 286, 100 S.E.2d 860, 866 (Sup. Ct. 1957).
However, here plaintiff has neither pleaded nor proved a cause of action for malicious prosecution and she has failed, for the reasons detailed above, to establish the asserted malpractice claim.
I would not only affirm the judgment in favor of Carrier Clinic and reverse the judgment against Dr. Borrus but also would reverse the judgment against Dr. Pessel.
CARTON, J.A.D.
I agree that the judgment dismissing plaintiff's action against Carrier Clinic was proper and that the judgment against defendant Dr. Borrus should be reversed. However, in my view the jury was justified in awarding plaintiff the verdict of $5,000 against defendant Dr. Pessel, representing punitive damages for falsely certifying as to his examination of plaintiff.
On August 15, 1965, notwithstanding the fact that he had not seen or treated plaintiff since the previous March, Dr. Pessel certified that on that day he made a personal examination of plaintiff and that in his opinion it was necessary to restrain and confine plaintiff for her own safety and that of her relatives. In an effort to give color or validity to that conclusion, he stated further that she had "threatened suicide and homicide [and was] violent at times and dangerous;" that she was "highly excited and excitable" and was unwilling to cooperate in any direction; and that she was violent in her attacks on her docile husband and often kept him awake all night. Dr. Pessel assigned arteriosclerosis, coronary disease and diabetes as the supposed causes of plaintiff's condition. He then certified, not only that plaintiff was insane, but also that restraint and confinement were necessary.
This certificate and that of Dr. Borrus were required to be made, under oath, in accordance with N.J.S.A. 30:4-29. *569 The statute also mandates that "Every certificate shall set forth the date of the making of the personal examination of the subject of the action, which must be made in every case by the physician signing the certificate not more than ten days prior to the admission of such person to the institution." N.J.S.A. 30:4-30.
This certification was required as a prerequisite for the proposed Class "B"[1] detention or commitment of plaintiff. Class "B" detentions include:
"all cases where the condition of the patient, in the judgment of the certifying physician, is such that he should be placed under immediate restraint in an institution, and where an order of temporary commitment can be obtained prior to his admission into such institution." N.J.S.A. 30:4-37 (emphasis added)
That section, in pertinent part, further provides:
"In all such cases a statement of such condition of the patient must appear in the certificates of the physicians certifying to the insanity of the patient. * * * The order of temporary commitment, complaint and certificates shall be filed with the chief executive officer of the institution before or at the time of the admission of the patient to such institution and shall be the warrant and authority for the admission and detention of the patient for a temporary period not exceeding 20 days from the date thereof. * * *" (Emphasis added)
On the basis of both Dr. Pessel's certification of insanity and the need of restraint and confinement, and Dr. Borrus' accompanying certificate, plaintiff was committed to Carrier Clinic.
*570 The information contained in Dr. Borrus' certification differs considerably from that contained in the certification by Dr. Pessel. Dr. Borrus gave as the supposed cause of her commitment "her psychosis, her cerebral arteriosclerosis and paranoid features." He reported that her appearance and manner were uncooperative, suspicious and illogical, and that she revealed "ideas and delusions of a persecution nature and infidelity directed toward husband." Unlike Dr. Pessel, a general practitioner who unabashedly proclaimed that restraint and confinement were necessary for "the safety of patient and relatives," Dr. Borrus, a psychiatrist, merely opined that this was necessary "for her welfare, observation and treatment."
Dr. Shoemaker, the assistant clinical director at Carrier, whose responsibility at that time was to admit new patients, examined the commitment papers and also made a mental examination of plaintiff before she was actually admitted to that institution. His examination revealed that she was cooperative but angry; that she thought she was tricked into the hospital and neither felt sick nor saw the need to be there; that although she had delusions regarding her husband's fidelity, her stream of mental activity was coherent and relevant; that there was no evidence of hallucination at the time of her examination, and that she was oriented in all her spheres.
When Dr. Shoemaker informed plaintiff that she must remain in the hospital, she became very angry and excited and wanted to leave. Thereupon he ordered medication in the form of an injection of sodium amytol and confinement of plaintiff in a "seclusion room." The witness described this "seclusion room" as measuring 7' x 7', with a single window and a little door with a tiny peek-hole in it for the purpose of permitting undetected observation from the outside, and devoid of any furniture except for a mattress on the floor. Before being placed there she was stripped. The patient was later released from the "seclusion room" and given an injection of a muscle relaxant and anesthetic known as *571 sodium penthothal. (She was confined to that room on one other occasion.) She was also administered electric shock treatment  a procedure consisting of the placing of electrodes on her temple which transmitted 150 volts of electricity through the nervous system. She received such electric shock treatments on eight different occasions during her stay at the institution.
I agree with the conclusion of my colleagues that the proofs establish a deviation by defendant Dr. Pessel from the controlling standard of practice or conduct and that the trial court erred in ruling there was no proof of his negligence. I have some reservations, however, as to whether the proofs may not also have established that some injury resulted from that malpractice. But since the proofs fully establish a cause of action for false imprisonment, and since recovery on that ground may fairly be deemed to include any such injury arising therefrom, it is unnecessary to pursue the malpractice charge further.
Let us consider those proofs and the nature of an action for false imprisonment. False imprisonment was one of the earliest known torts at common law. Like assault and battery, it was regarded as a trespass to the person. See 1 Harper & James, Law of Torts, § 36 (1956). The authors comment further: "The law of false imprisonment protects that interest in personalty described as the interest in freedom from confinement."
Restatement, Torts 2d, § 35 (1965), sets forth the elements of false imprisonment in this fashion:
"An actor is subject to liability to another for false imprisonment if
(a) he acts intending to confine the other or a third person within boundaries fixed by the actor, and
(b) his act directly or indirectly results in such a confinement of the other, and
(c) the other is conscious of the confinement or is harmed by it."
It can scarcely be denied that the essential elements of this tort thus defined in the Restatement have been established in the case of Dr. Pessel. But recovery may still *572 be defeated by a showing of the existence of legal justification. See Cannon v. Krakowitch, 54 N.J. Super. 93, 98 (App. Div 1959); Jorgensen v. Pennsylvania R.R. Co., 38 N.J. Super. 317, 349 (App. Div. 1955). And see Earl v. Winne, 14 N.J. 119, 128 (1952), where the court pointed out that the essential element of the tort is the constraint of the person without legal justification.
It is not contended that Dr. Pessel acted malevolently or vindictively. Nevertheless, contrary to the express command and salutary purpose of the statute in requiring a fresh examination before a person may be committed to an institution, this defendant knowingly certified falsely that he had made the required examination within ten days prior to admission, when, in fact, he had not treated plaintiff for a period of some five months. This alone would suffice to show that defendant's conduct was legally indefensible and, absent any privilege which might confer immunity upon him, justified the jury in assessing punitive damages against him.
The circumstances of this case provide an even more substantial basis for a finding that no legal justification existed for plaintiff's confinement. Before a person may be temporarily committed to an institution under the statute, the physician must certify the condition of such patient is such that "he should be placed under immediate restraint in an institution." N.J.S.A. 30:4-37. The general test as to the nature of the insanity warranting immediate involuntary restraint is whether there is a danger that the patient may injure herself or some other member of the public. In re Heukelekian, 24 N.J. Super. 407 (App. Div. 1953). As Harper and James state the rule,
"Either an officer or a citizen may take in custody an insane person when it is reasonably necessary to prevent threat of harm to himself and others. But mere insanity of a harmless character does not create the privilege, and the actor must show the peril if he would have immunity." 1 Harper & James, Law of Torts, § 318, p. 283 (1956).
*573 The proofs fall far short of demonstrating that plaintiff's condition was such, as a matter of law, as to require restraint for her own protection or the safety of others  especially where, as here, there was no hearing before the commitment. It is beside the point that plaintiff may have needed certain treatment and may have benefited from the particular treatment she received and which was administered without her consent. Such circumstances may be relevant to the issue of compensatory damages, but the fundamental inquiry remains whether the treatment she received required, of necessity, confinement and involuntary restraint.
Here, Dr. Pessel's statement that plaintiff had threatened suicide and homicide and was violent and dangerous is hardly borne out by the proofs  let alone demonstrated to the extent that the issue should not have been submitted to the jury. He conceded that since he had not treated plaintiff during the five-month period preceding the date of his statement, he had no actual knowledge of her condition on the latter date. His information was based entirely upon statements made to him months earlier by one of plaintiff's relatives who was desirous of having her confined. Dr. Borrus also conferred with one of plaintiff's relatives before he examined her, but his certification did not set forth any emergency conditions which would even colorably require immediate restraint or confinement.
What is of controlling significance is that the hospital records show that during her confinement there was never any attempt at suicide, let alone attack on others. It does appear that on one occasion, after plaintiff had been confined for some two weeks, and after she had received her fourth electrical shock treatment, she wished to go home and when permission was denied began to pack her bag, yell and kick the door and allegedly said, "She won't let me go home. I will suicide myself." Thereupon, she was placed in solitary confinement in the seclusion room. Without her prior consent, of course, plaintiff could not have been subjected to solitary confinement as part of the treatment administered *574 to her. Nor could she have been obliged to undergo the rigors of the numerous electrical shock treatments which she received without her consent.
Dr. Shoemaker, who examined plaintiff upon her admission, described the hospital practice in dealing with potential suicide patients: "If we find a patient is suicidal we put them on suicide order. The doctor will order it." That there was no real danger is evident from this physician's testimony that, although he found her depressed, he did not find her actively suicidal, and that for this reason she was not placed on "suicide precaution."
The only remaining inquiry is whether there existed any privilege which might relieve Dr. Pessel, as a certifying physician, from responsibility because the false imprisonment comprised an element of a legal proceeding. The conclusion is inescapable that there is no basis in justice or precedent which dictates that such a privilege should be extended to this defendant in this case.
The vagueness and confusion found in the authorities as to the nature of the defense of privilege in suits for false imprisonment may often be attributable to the fact that such actions are sometimes inappropriately labeled as actions for false arrest. Additionally, claims for false imprisonment are often joined with claims for malicious prosecution, assault and battery or defamation  all of which may overlap to a certain extent. If a cause of action is found to exist on any one of the grounds asserted, there may appear no necessity for defining the precise basis for the relief granted since damages recoverable, whatever the basis, would be virtually the same. See Prosser, Torts (3d ed. 1964), § 12, p. 54; Price v. Phillips, 90 N.J. Super. 480, 484 (App. Div. 1966).
The theory is that where it appears a person has illegally instituted a criminal proceeding resulting in a confinement (and for present purposes, an action for commitment of an insane person may be considered in the same light), the elements of false imprisonment have been demonstrated. *575 However, since such confinement or imprisonment comprises a part of, or is an incident to, the larger offense of malicious prosecution, public policy decrees that the person instituting such action should be afforded the same rights as any other person accused of malicious prosecution, whether or not that proceeding culminates in an imprisonment. In such a case, therefore, it is said that there must be a showing of malice and lack of probable cause on the part of the person who institutes the action, a termination of the proceeding in favor of the accused, and resulting damage. See Heyman v. Stein, 96 N.J. Super. 586, 587, 589 (App. Div. 1967). See generally, Prosser, op. cit., § 113, pp. 868-870.
The foundation upon which this extraordinary privilege (i.e., immunity where the three elements just mentioned have been established) rests is that the private prosecution of public offenses is regarded as essential to the enforcement of the criminal law (and by analogy, commitment of dangerously insane persons), and that it is necessary to grant immunity to the one who initiates or instigates the proceeding.
The source and basis of this privilege is clearly articulated in Restatement, Torts 2d, § 37 comment (b) (1965):
"One who institutes criminal proceedings against another intends to cause an arrest which is the normal incident of such proceedings. In such case, however, the actor is liable only if the confinement which the arrest involves is a part of the greater offense of instituting such proceedings without reasonable cause and for a purpose other than that for which the proceedings are provided. Therefore, unless the private prosecutor takes an active part in the service of a warrant issued in the criminal prosecution which he has instituted, his liability for the arrest is enforced only by the imposition of damages in aggravation of those recoverable for the malicious prosecution itself. This, in addition to the fact that the private prosecution of public offenses is regarded as essential to the enforcement of the criminal law and that therefore the private prosecutor is given the protection of an exceptionally favorable privilege, makes it necessary to state the rules which determine the liability for an arrest caused by the institution of criminal proceedings as part of the subject of malicious prosecution. See Chapter 29." (Emphasis added)
*576 This exposition of the basis for treating the two separate offenses of false imprisonment and malicious prosecution in the same manner where both claims may exist explains the following further comment which appears in section 45 (a) of the Restatement and similar comments in Prosser, op. cit., § 12, p. 62:
"One who instigates or participates in the unlawful confinement of another is subject to liability to the other for false imprisonment. One who instigates or participates in a lawful arrest, as for example an arrest made under a properly issued warrant by an officer charged with the duty of enforcing it, may become liable for malicious prosecution, as stated in Chapter 29, or for abuse of process, as stated in Chapter 31, but he is not liable for false imprisonment since no false imprisonment has occurred. * * *" (Emphasis added)
The privilege (immunity) is thus extended to the person who institutes or instigates the action. Privileged also are the judicial officer who signs the order relying on the commitment papers furnished him, and persons who rely upon the judicial process in bringing about the imprisonment, such as the individuals serving process and the officials of the institution or public agency where the confinement takes place. See Prosser, op. cit.; 1 Harper & James, op. cit., § 3.21; Genito v. Rabinowitz, 93 N.J. Super. 225 (App. Div. 1966); Cooke v. J.J. Newberry & Co., 96 N.J. Super. 9, 12 (App. Div. 1967).
But there is no public policy which would warrant extending this extraordinary privilege to the action of a physician whose unlawful conduct in making a knowingly false affidavit results in restraint or confinement. He cannot be said to fall within the category of one who instituted the action or one who instigated it. Nor could the issuance of the order of arrest serve to insulate him from responsibility for his acts. Unlike the process servers and the officials at Carrier Clinic, he did not rely upon the apparent validity of the court order. He knew of its fatal defect, for he himself had caused it. In this connection, it is significant that the Legislature has in precise terms specified that "the order of *577 temporary commitment, complaint and certificates * * * shall be the warrant and authority for the admission and detention of the patient * * *." N.J.S.A. 30:4-37 (emphasis added).
The public policy which ordains that protection be given to a private prosecutor as an instrument of the law enforcement process is not furthered by protecting one who flouted the law and whose forbidden action was a contributing cause of the false imprisonment.
Since the judgment in favor of plaintiff against defendant Dr. Pessel must be affirmed as modified, it is unnecessary to determine whether plaintiff might also have established the elements of a cause of action for malicious prosecution. Plaintiff made no claim of this nature against this defendant. Furthermore, as already noted, it does not appear that Dr. Pessel, although a contributing cause to the ultimate imprisonment, either initiated or instigated the proceeding or that he conspired to bring about any such result. It is therefore at least doubtful whether such an action would lie in any event. Certainly, immunity may not be extended to this defendant and recovery denied to this plaintiff merely because another more dubious remedy might be available had she formulated her claim on such a theory.
Judgment in the amount of $5,000, with costs, should be entered against defendant Dr. Pessel.
GOLDMANN, S.J.A.D. (concurring in part).
I agree with Judge Carton that the proofs fully established a cause of action for false imprisonment. What Dr. Pessel did was a proximate cause of plaintiff's confinement; but for his affidavit and that of Dr. Borrus, both apparently regular on their face, there would have been no order of temporary commitment entered by the municipal magistrate on August 17, 1965. That order should not insulate Dr. Pessel from responding in damages for false imprisonment.
In view of my conclusion, I find it unnecessary to consider whether the proofs established that plaintiff's condition was *578 such, as a matter of law, as to require restraint for her own protection.
Accordingly, I join with my colleagues in concluding that the judgment in favor of defendant Carrier should be affirmed and the judgment in favor of plaintiff against defendant Dr. Borrus reversed. However, I agree with Judge Carton that the judgment against defendant Dr. Pessel should not be reversed. The judgment against him should be modified by eliminating the $500 awarded by reason of the defective notarization and, as so modified, affirmed with costs.
NOTES
[1] The requirement that the physician's certificate be under oath was eliminated by the amendment to N.J.S.A. 30:4-29, accomplished by L. 1965, c. 59, approved May 27, 1965. However, chapter 59 was not to become effective until 90 days after its enactment, so that the statutory requirement that the certificate be under oath was still in effect on August 15, 1965 when Borrus signed the certificate.
[2] Although not of controlling significance, the record discloses the following sequence of events between that date and February 24, 1966 when the complaint in this action was filed.

On September 27, 1965 the president of Carrier sent to plaintiff's husband, in response to his telephoned request, "an itemized statement of charges for [his] wife's hospitalization, together with a breakdown of all drug charges" and advised him that a copy of the medical record had been sent to the "referring physician."
By letter dated November 22, 1965 the husband's attorney Harold Sklarew, wrote Carrier's president as follows:
"My client, Frank DiGiovanni, has consulted me about a statement which he has received from the Carrier Clinic. He has, on several occasions, requested an explanation of the treatment given to his wife and the justification and necessity therefor.
Mr. DiGiovanni has been informed that his wife was locked in solitary confinement in a dark room and received double strength shock treatment and was confined to grossly substandard quarters for 15 days.
I would appreciate your personal attention to this matter so that Mr. DiGiovanni can receive proper explanation of the same."
In the first week of December 1965 plaintiff's husband visited Carrier in the company of a friend, Murray Greengarten (called as a witness by plaintiff), and complained of the treatment his wife had received and of his not having been allowed to see his wife during the first two weeks of her stay.
Similar complaints were contained in a letter dated October 18, 1965 written by the husband to the Attorney General, a copy of which, with a request for an explanation, was sent on December 10, 1965, to Carrier by the State Division of Mental Health to which the husband's letter had been forwarded on December 1, 1965.
In December 1965, pursuant to written authorization from plaintiff, a copy of her medical records was delivered to her husband. In February 1966 Carrier forwarded an abstract of its records to Charles E. Stein, plaintiff's present attorney, after receiving written authorization from both plaintiff and her husband.
[1] Class "A" cases are those where the condition of the patient "in the judgment of the certifying physician, is such that immediate temporary admission to an institution pending a judicial hearing and final order of commitment is not necessary." N.J.S.A. 30:4-36. Class "C" cases are those where the condition of the patient, "in the judgment of the certifying physician, is such that the patient should be placed under immediate restraint and confinement in an institution, and where it is impossible to obtain a temporary commitment from a municipal court or court of record. * * *" N.J.S.A. 40:4-38.