266 N.J. Super. 140 (1993)
628 A.2d 829
FAIR OAKS HOSPITAL, A CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFF,
v.
SUSAN L. POCRASS AND MICHAEL POCRASS, DEFENDANTS. SUSAN L. POCRASS, DEFENDANT, THIRD-PARTY PLAINTIFF,
v.
FAIR OAKS HOSPITAL, A CORPORATION OF THE STATE OF NEW JERSEY, MUKEJM D. PATEL, M.D.; CHARLES CIOLINO, M.D.; ROBERT MOREINES, M.D.; JANE DOE, A FICTITIOUS NAME, JOHN DOE, A FICTITIOUS NAME, AND ROBERT ROE, A FICTITIOUS NAME; THIRD PARTY DEFENDANTS.
Civ. A. No. UNN-L-6061-90.
Superior Court of New Jersey, Law Division Union County.
May 3, 1993.
*143 Joseph K. Cooney, for plaintiff/third party defendant Fair Oaks Hospital (Widman & Cooney, attorneys; Arthur M. Pavluk, III, on the brief).
Thomas F. Chansky, for third party defendants Mukejm D. Patel, M.D. and Charles Ciolino, M.D. (Lynch, Martin, Philibosian, Chansky, Fitzgerald, & Kane, attorneys; Jessica E. Chopor on the brief).
Michael L. Lazarus, for third party defendant, Robert Moreines, M.D., (Donington, Karcher, Leroe, Salmond, Luongo & Ronan, attorneys).
David B. Rubin, for defendant/third-party plaintiff Susan L. Pocrass (Rubin, Rubin, Malgran, Kaplan & Kuhn, attorneys; Mr. Rubin and Lee Emmer on the brief).
MENZA, J.S.C.
The defendant/third party plaintiff, Susan Pocrass, moves in limine for a ruling that the third party defendant Dr. Charles Ciolino is liable to her for false imprisonment and negligence.
This case involves claims for false imprisonment and medical malpractice arising from an alleged violation of New Jersey's civil commitment statute, N.J.S.A. 30:4-27.1 to 27.23.
In the fall of 1989, Michael Pocrass consulted with an attorney about his wife's behavior and the marital difficulties he and his wife were having. Apparently, Mrs. Pocrass had been exhibiting peculiar behavioral patterns involving a fear of contamination which manifested itself in the ritualistic showering and recleansing of her body. The attorney put Mr. Pocrass in touch with Dr. Robert Moreines, a psychiatrist affiliated with Fair Oaks Hospital, *144 to discuss whether Mrs. Pocrass's behavior warranted professional help. Dr. Moreines referred Mr. Pocrass to another psychiatrist, Dr. Charles Ciolino, who was employed by Psychiatric Associates of New Jersey, a group of doctors who maintained an office in Fair Oaks. After some prodding by Mr. Pocrass, Mrs. Pocrass agreed to visit Dr. Ciolino and did so on two occasions, on October 11 and November 1, 1989. Dr. Ciolino diagnosed Mrs. Pocrass as suffering from an obsessive compulsive disorder. Although urged to continue with Dr. Ciolino, Mrs. Pocrass refused further treatment. On November 16, 1989, Mr. Pocrass contacted Dr. Ciolino and advised him that his wife's condition had deteriorated and asked for his help in dealing with the problem. The next day Mr. Pocrass again contacted Dr. Ciolino and informed him that his wife's condition had reached crisis proportions. Specifically, he explained that his wife's fear of contamination had worsened, that her cleansing rituals had increased, that she was fatigued and not eating, and that she was not properly caring for their infant daughter.
Dr. Ciolino contacted Mrs. Pocrass and made an appointment for November 20, 1989. Mrs. Pocrass cancelled the appointment. On November 22, 1989, Dr. Ciolino met with Mr. Pocrass and both proceeded to the Spotswood Police Department, where Dr. Ciolino presented to the police an application for civil commitment and requested their assistance in taking Mrs. Pocrass to a place where she could be treated for her mental condition. Dr. Ciolino, Mr. Pocrass and two police officers then proceeded to the Pocrass home where, after observing Mrs. Pocrass and the condition of the house, Dr. Ciolino determined that Mrs. Pocrass was mentally ill and a danger to herself and others. He signed a physician's certification to that effect. At Dr. Ciolino's direction, the police officers took Mrs. Pocrass into custody, strapped her to a stretcher, and transported her by ambulance to Fair Oaks Hospital.
Dr. Mukejm D. Patel attempted to examine Mrs. Pocrass when she arrived at Fair Oaks Hospital but Mrs. Pocrass refused to permit him to examine her. Based on his observation of Mrs. *145 Pocrass and the information provided to him by Dr. Ciolino and Mr. Pocrass, Dr. Patel concluded that Mrs. Pocrass was mentally ill and a danger to herself and others. He completed and signed a physician's certification to that effect.
Both physicians' certificates, along with the application for commitment which had been prepared by Dr. Ciolino and signed by Mr. Pocrass, were then presented to a municipal court judge who on the very same day signed an order of temporary commitment. A commitment hearing was held on December 8, 1989. At the conclusion of the hearing, the court found that Mrs. Pocrass was a danger to herself and/or others and continued her commitment for an additional 14 days. A commitment hearing was held by a superior court judge on December 20, 1989. The court concluded that Mrs. Pocrass was no longer a danger and she was therefore discharged.[1]
Mrs. Pocrass contends that Dr. Ciolino falsely imprisoned her and was negligent in his failure to comply with the civil commitment statute.
The New Jersey civil commitment statute provides for two separate methods to commit a person involuntarily. One method is by referral from a state-designated "screening service" located in the county where the person resides. N.J.S.A. 30:4-27.10(a). *146 The other is with the certificates of two private psychiatrists, without "screening service" involvement. N.J.S.A. 30:4-27.10(b). Both methods require two physicians' certifications and a court order. The criteria for commitment is that a person must be a danger to himself or others:
A person shall not be involuntarily committed to a short-term care or psychiatric facility, or special psychiatric hospital unless the person is mentally ill and that mental illness causes the person to be dangerous to self or dangerous to others or property, and appropriate facilities or services are not otherwise available. N.J.S.A. 30:4-27.9(b).
In 1987, the New Jersey Legislature substantially overhauled and streamlined the substantive and procedural aspects of its civil commitment laws. The focus and the linchpin of the new law is the mental health "screening service," defined in the statute as:
[A] public or private ambulatory care service designated by the commissioner, which provides mental health services including assessment, emergency and referral services to mentally ill persons in a specified geographic area. N.J.S.A. 30:4-27.2(z).
The statute sets forth how a screening service is designated:
The commissioner, in consultation with the appropriate county mental health board and consistent with the approved county mental health plan, shall designate one or more mental health agencies or facilities in each county or multi-county region in the State as a screening service. The commissioner shall so designate an agency or facility only with the approval of the agency's or facilities's governing body. N.J.S.A. 30:4-27.4.
And it specifically states that the screening mechanism is the preferred process for entry into a facility:
In designating the screening services, the commissioner shall ensure that screening services are accessible to all persons in the State who need these services and that screening service evaluation is the preferred process for entry into short-term care facilities or psychiatric facilities so that appropriate consideration is given to less restrictive treatment alternatives. Ibid.

Additionally, the statute details the purpose of a screening center:
A screening service shall serve as the facility in the public mental health care treatment system wherein a person believed to be in need of commitment to a short-term care, psychiatric facility or special psychiatric hospital undergoes an assessment to determine what mental health services are appropriate for the person and where those services may be most appropriately provided. N.J.S.A. 30:4-27.5(a).
*147 The statute also sets forth the circumstances in which a police officer may take a person into custody and provides that the law enforcement officer who does so must take the person to a screening center:
A State or local law enforcement officer shall take custody of a person and take the person immediately and directly to a screening office if:
a. On the basis of personal observation, the law enforcement officer has reasonable cause to believe that the person is in need of involuntary commitment;
b. A mental health screener has certified on a form prescribed by the division that based on a screening outreach visit the person is in need of involuntary commitment and has requested the person be taken to the screening service for a complete assessment;[2] or
c. The court orders that a person subject to an order of conditional discharge issued pursuant to subsection c. of section 15 of this act who has failed to follow the conditions of the discharge be taken to a screening service for an assessment. N.J.S.A. 30:4-27.6.
There is no authority in the statute for the police officer to take the person to any facility other than a screening service. The statute details the circumstances and procedure for commitment to a hospital from the screening center. N.J.S.A. 30:4-27.9.
If the person is not first taken to a screening service by a law enforcement officer, the statute provides that two physicians' certificates along with an application for commitment are to be submitted to a judge to request a temporary order of commitment. Only after the court order is obtained may the person then be taken into custody, and even then he may only be transported to a short term facility.[3] There is no authority in this law which *148 permits a physician, based only on his certification of mental illness and dangerousness, to transport a person to any facility.
Fair Oaks Hospital has not been designated as a screening service. Thus, in the instant case, there was neither compliance with the screening service procedure for commitment nor with the procedure which requires a court order for commitment based on two physicians' certificates.
Dr. Ciolino argues, however, that a violation of the commitment statute does not in itself constitute a deprivation of a person's liberty. He contends that Mrs. Pocrass did not suffer a deprivation of liberty since a second physician's certificate and a court order were obtained a very short time after she arrived at Fair Oaks. A federal case seems to support the third party defendant's position. In the case of Chathas v. Smith, 884 F.2d 980 (7th Cir.1989), the plaintiff brought a § 1983 civil rights action, seeking damages on the allegation that authorities had attempted to commit him involuntarily without having complied with the Illinois Mental Health Code. The court dismissed the plaintiff's claim, holding:
[T]he failure of the defendants to follow the procedures set forth in ... the Illinois Mental Health Code does not by itself deprive [the plaintiff] of any liberty interest. A state created procedural right is not itself a liberty interest. Id. at 987.
A determination of whether a failure to comply with New Jersey's screening statute constitutes a liberty deprivation requires a review and analysis of the underlying intent and purpose of the new screening law. A special task force of the National Center for State Courts established the Guidelines for Involuntary Civil Commitments. The task force commented that:
The purpose of screening agencies is to provide an organizational and administrative structure for equitable and uniform decisionmaking about mental health treatment and services in the least restrictive setting at the earliest possible point in involuntary civil commitment proceedings ... [T]he aim of the screening is to facilitate getting help for the individual referred, and not necessarily to help provide involuntary mental health services. That is, the aim is to find the most appropriate mental health treatment, care, or social services consistent with the individual's needs. Guidelines for Involuntary Civil Commitment, 10 Mental & Physical Disability Law Reporter at 427-29 (Sept./Oct. 1986).
*149 The legislative findings and declarations of New Jersey's involuntary commitment statute are in accord with this purpose:
It is the policy of this State to encourage each county or designated mental health service area to develop a screening service and a short-term care facility which will meet the needs for evaluation and acute care treatment of mentally ill persons in the county or service area. The State encourages the development of screening services as the public mental health system's entry point in order to provide accessible crisis intervention, evaluation and referral services to mentally ill persons in the community; to offer mentally ill persons clinically appropriate alternatives to inpatient care, if any; and, when necessary, to provide a means for involuntary commitment. Similarly, the State encourages the development of short-term care facilities to enable a mentally ill person to receive acute, inpatient care in a facility near the person's community. Development and use of screening services and short-term care facilities throughout the State are necessary to strengthen the Statewide community mental health system, lessen inappropriate hospitalization and reliance on psychiatric institutions and enable State and county facilities to provide the rehabilitative care needed by some mentally ill persons following their receipt of acute care. N.J.S.A. 30:4-27.1(d).
In this case, the third party defendant seems to trivialize Mrs. Pocrass's causes of action for false imprisonment and negligence and seems to suggest, to use a colloquialism, that she is making a "big deal" out of a minor incident. He argues that if the proper procedure was not used initially, it was immediately rectified when the second doctor executed a certification and the court order for the temporary commitment was signed. Besides, Dr. Ciolino argues, Mrs. Pocrass was in need of treatment because her behavior was bizarre and it was obvious that she presented a danger to herself or others. Under the circumstances, he asserts that Mrs. Pocrass suffered little or no harm and, in fact, benefited by the procedure utilized to effectuate her confinement. Dr. Ciolino misses the point. What he fails to realize is that involuntary commitment  the confinement of people who have committed no crime and have not in any way violated the rules of our society  is a profound and dramatic curtailment of a person's liberty and as such requires meticulous adherence to statutory and constitutional criteria. In fact, the United States Supreme Court has time and again recognized this proposition that a great deprivation of liberty results from involuntary civil commitment.
*150 In the case Zinermon v. Burch, 494 U.S. 113, 131, 110 S.Ct. 975, 992, 108 L.Ed.2d 100, 117 (1990), the Court stated:
Petitioners do not seriously dispute that there is a substantial liberty interest in avoiding confinement in a mental hospital. See Vitek v. Jones, 445 U.S. 480, 491-492, 63 L.Ed.2d 552, 100 S.Ct. 1254 [1262-1263] (1980) (commitment to mental hospital entails "`a massive curtailment of liberty,'" and requires due process protection); Parham v. J.R., 442 U.S. [584], at 600, 61 L.Ed.2d 101, 99 S.Ct. 2493 [2503] (there is a "substantial liberty interest in not being confined unnecessarily for medical treatment"); Addington v. Texas, 441 U.S. 418, 425, 60 L.Ed.2d 323, 99 S.Ct. 1804 [1809] (1979) ("[C]ivil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection").
Succinctly, in the case of In re Ballay, 482 F.2d 648, 655 (D.C. Cir.1973), the court, quoting Morrissey v. Brewer, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484, 493 (1972), said:
[T]here can no longer be any doubt that the nature of the interests involved when a person ... [is] involuntarily committed ... is one within the contemplation of the "liberty and property" language of the Fourteenth Amendment.
Recognizing the deprivation of liberty resulting from involuntary commitment, the Legislature has made it clear that involuntary commitment must strictly adhere to the safeguards of the statute:
Because involuntary commitment entails certain deprivations of liberty, it is necessary that State law balance the basic value of liberty with the need for safety and treatment, a balance that is difficult to effect because of the limited ability to predict behavior; and, therefore, it is necessary that State law provide clear standards and procedural safeguards that ensure that only those persons who are dangerous to themselves, to others or to property, are involuntary committed. N.J.S.A. 30:4-27.1(b).
The third party defendant also fails to realize the inherent difficulties of defining mental illness,[4] the imperfect criteria of a danger to oneself and others,[5] and the admitted inability of *151 psychiatrists to predict dangerousness.[6]
Thus, Dr. Ciolino's violation of the statute in this case was not merely an insignificant intrusion on Mrs. Pocrass's rights. It was, rather, a breach of some moment. It resulted in serious consequences to her, not least of which was confinement for a period of about a month. All of which may have been avoided if Mrs. Pocrass had been first brought to a screening service.
What then should be Mrs. Pocrass's cause of action? She has brought suit for negligence and false imprisonment. As to the negligence cause of action, the commitment statute sets forth the standard of conduct. Deviation from that standard may constitute proof of negligence. Evers v. Davis, 86 N.J.L. 196, 204, 90 A. 677 (E. & A. 1914). In the present case, there was a failure *152 to follow the statutorily prescribed involuntary commitment standards. Thus, the failure to follow the statutory procedure is evidence of negligence for a fact finder to consider, and not negligence per se.
The elements of false imprisonment are set forth in the Restatement, (Second) of Torts, § 35 (1965):
(1) An actor is subject to liability to another for false imprisonment if
(a) he acts intending to confine the other or a third person within the boundaries fixed by the actor, and
(b) his act directly or indirectly results in such a confinement of the other, and
(c) the other is conscious of the confinement or is harmed by it.
There is no doubt that elements (b) and (c) have been satisfied in that there was a confinement of Mrs. Pocrass of which she was conscious. With regard to the intent element, Mrs. Pocrass need only prove that Dr. Ciolino intended to confine her. It is only his intent to confine which is relevant. His motive and justification for doing so are not. As stated in Prosser and Keeton on Torts:
Although intent is necessary, malice in the sense of ill-will is not. There may be liability, although the defendant believes in good faith that the [confinement] was justified or that the defendant was acting in the plaintiff's "own good." [W. Page Keeton, et al., Prosser and Keeton on the Law of Torts § 11, at 53 (5th ed. 1984).]
In this case, however, the third party defendant contends that Mrs. Pocrass's cause of action is one for malicious prosecution, not one for false imprisonment, and argues that since she has failed to demonstrate malice  a requirement of malicious prosecution  on the part of Dr. Ciolino, the cause of action must fail.
In the case of DiGiovanni v. Pessel, 104 N.J. Super. 550, 250 A.2d 756 (App.Div. 1969), the court addressed the question of the appropriate cause of action to be afforded to the plaintiff, where a psychiatrist executed a commitment certificate without having had examined the plaintiff, though he stated in the certification that he had. The court was divided in its holding. Two judges concluded that the plaintiff's causes of action were for negligence and false imprisonment. Id. at 564, 250 A.2d 756. The other concluded that they were ones for negligence and malicious prosecution. Ibid. His position was that the plaintiff had a cause of action for *153 malicious prosecution rather than false imprisonment, because the defendant had acted under color of authority. Id. at 565, 250 A.2d 756. The two judges who found that plaintiff had a cause of action for false imprisonment disagreed, concluding that the doctor had not acted under color of the law, as demonstrated by his flagrant conduct in knowingly signing a false affidavit. Ibid.
In Earl v. Winne, 14 N.J. 119, 101 A.2d 535 (1953), the Supreme Court noted the differences between false imprisonment and malicious prosecution. The fundamental difference is that under the claim of false imprisonment, the detention is done without color of authority. Id. at 128, 101 A.2d 535.
The treatise American Jurisprudence explains the differences this way:
False imprisonment and malicious prosecution are closely related causes of action, and the two are sometimes confused by the courts. However, the distinction between them is fundamental, the essential difference being the validity of the legal authority for the restraint imposed. In malicious prosecution the detention is malicious but under due form of law, whereas in false imprisonment the converse is true. The detention is unlawful, but malice and lack of probable cause are not essential, as a general rule, to the cause of action. Thus, where the process on which an arrest is made is regular and legal in form and issued by a court of competent authority, but is sued out maliciously and without probable cause, the remedy is an action for malicious prosecution. But a suit for false arrest or imprisonment is the proper action where the aggrieved party is arrested without legal authority, as where he is arrested pursuant to process that is void. In the case of malicious prosecution, the valid process justifies the restraint or imprisonment, and the gist of the cause of action is malice or evil intent. In false imprisonment, on the other hand, the essence of the tort consists in depriving the plaintiff of his liberty without lawful justification. 32 Am.Jur.2d, False Imprisonment § 4 (1982).
It is this court's opinion that Mrs. Pocrass has a cause of action for false imprisonment, not one for malicious prosecution, because she was restrained by Dr. Ciolino under a law which no longer existed and thus it was a restraint without legal authority. Admittedly, Dr. Ciolino acted under the authority of a law which only had been repealed a few months before the incident and that under the circumstances they might have thought was still good law. Nevertheless, Dr. Ciolino is a psychiatrist, and is charged with the knowledge of existing law and is mandated to abide by it.
*154 Additionally, the court must note that one would be hard pressed to characterize the facts of this case, in which a person is forcibly taken from her home, strapped to a stretcher and rushed by ambulance to a mental hospital where she remains confined for a month, as an action for malicious prosecution. It is false imprisonment.
In conclusion, this court finds that the third party defendant Dr. Ciolino is liable to Mrs. Pocrass on her false imprisonment claim. However, her claim for medical malpractice must be determined by the trier of fact at trial.
The defendant/third party plaintiff's motion is granted in part.
NOTES
[1] It is interesting to note the similarity of the facts in this case to the genesis of the involuntary commitment laws. The involuntary commitment laws arose out of the involuntary commitment in 1860 of a woman by the name of E.P.W. Packard by her husband:

Mrs. Packard had been committed to a psychiatric institution upon her husband's petition pursuant to Illinois law which required no further evidence, save the superintendent's observation that a married woman was "evidently insane or distracted...." Upon her release, she began a campaign to "arouse public concern in order to make `railroading' to lunatic asylums impossible."
[1 Michael L. Perlin, Mental Disability Law: Civil and Criminal, § 2.03 at 43 n. 70 (1989), quoting, in part, Nicholas Kittrie, The Right To Be Different: Deviance and Enforced Therapy 65 (1973); see generally Hendrick Hartog, Mrs. Packard on Dependency, 1 Yale J.L. & Human. 78 (1988).]
[2] In an unpublished opinion, the Appellate Division held this language invalid because it would permit the police to take custody of an individual based solely on a telephone request from a "screener" without satisfying one of the statutory criteria set forth above. See In the Matter of the Appeal from the Adaptation Screening Center Regulations by the Department of Human Services, Docket No. A-5857-887, (App.Div. June 27, 1990).
[3] The screening statute was signed by the governor on May 7, 1987 and became law effective June 7, 1989, just two weeks before the commitment in this case. The commitment procedure utilized by Dr. Ciolino was under the old statute, N.J.S.A. 30:4-46.1.
[4] See Frederick, An Overview of Dangerousness: Its Complexities and Consequences, in Dangerous Behavior: A Problem in Law and Mental Health, 3, 9 (C.J. Frederick ed. 1978) (Dangerous Behavior) (discussing "circular reasoning" often employed in statutory definitions of mental illness in hospitalization statutes).
[5] "In psychiatry and other mental health circles, there is no generally accepted legal, psychiatric or medical meaning of the term." Brooks, Notes on Defining the Dangerousness of the Mentally Ill, in Dangerous Behavior, supra note 4, at 37,
[6] In the book Mental Health Law in New Jersey: Theory and Practice, the author states that:

Studies have shown that psychiatrists are wrong in their predictions more often than they are right, and that they may overpredict dangerousness by more than 50 per cent. Other studies have shown that lay persons predict dangerousness just as well, if not better than psychiatrists. See Hakeem, Prediction of Parole Outcome, 52 J.Crim.L.Criminology and Police Science 1465 (1961); Rappeport, et al., Evaluation and Follow-up of State Hospital Patients Who Had Sanity Hearings, 118 Am.J.Psychiat. 1078 (1962).... The American Psychiatric Association has concluded that psychiatrists have no expertise in predicting such behavior. Task Force Report 8: Clinical Aspects of the Violent Individual (July 1974).
[Anne C. Singer, Mental Health Law in New Jersey: Theory and Practice 97 (New Jersey Institute for Continuing Legal Education 1981).]
Even though, in his more recent research, Professor Monahan has found a "modest, positive relationship between some mental disorders and some violent behavior," see John Monahan, Mental Disorder and Violent Behavior: Perceptions and Evidence, 47 Am.Psychologist. 511, 514 (1992), at best, psychiatric predictions of violence still reveal a false positive rate of over 40%. See Donald Bersoff, Judicial Deference to Nonlegal Decisionsmakers: Imposing Simplistic Solutions on Problems of Cognitive Complexity in Mental Disability Law, 46 SMU L.Rev. 329, 356 (1992) (surveying all current research); see also, Perlin, supra, note 1, § 2.15, at 24-27 (1992 pocket part) (reviewing research).