477 S.E.2d 535

**Ruth RIFFE, Plaintiff Below, Appellant,**

v.

**William ARMSTRONG; Deborah Nolley; Dr. Phillip Robertson; Springhaven, Inc., A West Virginia Corporation; and Princeton Community Hospital Association, Inc., A West Virginia Corporation, Defendants Below, Appellees.**

No. 22980.

Supreme Court of Appeals of West Virginia.

Submitted March 5, 1996.

Decided July 17, 1996.

Rehearing Refused Sept. 5, 1996.

Rebecca M. Bell, Mary E. Griffith, Belle & Griffith, L.C., Princeton, for Appellant.

Edgar E. Bibb, III, Kenneth E. Knopf, Timbera C. Wilcox, Melissa R. Metzger, Cleek, Pullin, Knopf & Fowler, Charleston, for Appellees, William Armstrong, Deborah Nolley, and Springhaven, Inc.

William F. Foster, II, William J. Cooper, Jacobson, Maynard, Tuschman & Kalur, Charleston, for Appellee, Dr. Phillip Robertson.

Edward C. Martin, David S. Givens, Flaherty, Sensabaugh & Bonasso, Charleston, for Appellee, Princeton Community Hospital Association, Inc.

ALBRIGHT, Justice:

This civil action was brought in the Circuit Court of Mercer County, West Virginia, for money damages arising out of the attempted involuntary commitment of appellant, Ruth Riffe, under the provisions of W.Va.Code, § 27–5–1, *et seq.* Appellant claims she was falsely imprisoned by appellees William Armstrong, Deborah Nolley, Springhaven, Inc., and Princeton Community Hospital when she was held against her will in the Behavioral Medicine Unit at Princeton Community Hospital and when, against her will, she was subsequently placed in restraints and transported to and held at Beckley Appalachian Regional Hospital. She also claims that appellee Doctor Phillip Robertson committed medical malpractice in providing a physician's certificate for the involuntary commitment proceedings. Finally, appellant claims that all appellees intentionally inflicted emotional distress on her by their actions.

Doctor Robertson sought and was granted summary judgment on June 28, 1994. The

remaining appellees were granted summary judgment by order entered August 1, 1994. After motion made August 5, 1994, the court denied appellant relief from those judgments by order entered November 29, 1994. Appellant filed her appeal on March 29, 1995. Appellant contends that summary judgment was not proper because genuine issues of material fact remain unresolved. We agree and reverse and remand to the circuit court for further proceedings consistent with this opinion.

## FACTUAL AND PROCEDURAL SUMMARY

On January 2, 1992, appellant arrived by ambulance at Princeton Community Hospital, with her son, Robert Riffe, who was to be admitted to the Behavioral Medicine Unit (BMU) there for treatment, following hospitalization at Welch Emergency Hospital for a suicide attempt involving an overdose of drugs. Appellant and her son were discovered outside the BMU by nurse Linda Spangler as she returned from lunch. Appellant was distraught and crying. After attempting to console appellant, Ms. Spangler summoned appellee Deborah Nolley, a clinical psychologist who was familiar with Robert Riffe's case. Appellee Nolley inquired as to the cause of appellant's distress, and appellant replied that she would kill her husband and then kill herself so her son would be fine. Appellant appeared to be mentally confused and claimed she had not eaten or slept for three days.

Appellant and her son moved into the BMU. The parties give conflicting accounts of why this occurred. Appellant claims she was enticed into the unit with an offer of a cup of coffee, while appellees claim appellant entered the unit as a result of her son's encouragement. Nonetheless, shortly after appellant entered the unit and her behavior was observed, appellee Nolley prepared a petition (or application) for involuntary commitment pursuant to W.Va.Code § 27–5–2(a)(2) (1983).[1]

**1.** West Virginia Code § 27–5–2(a)(2) (1983) states:

(a) *When application for involuntary custody for examination may be made.*—Any adult person may make application for involuntary hos-

Appellee William Armstrong is the chief executive officer of appellee Springhaven, Inc., a nonprofit corporation that operates the BMU under contract with Princeton Community Hospital. Appellee Nolley consulted appellee Armstrong and they jointly determined that appellant was agitated, delusional, suffering from sleep and food deprivation, and possibly homicidal and suicidal. When efforts to calm her failed and offers of housing and food were rejected, Armstrong and Nolley approached Doctor Phillip Robertson, a psychiatrist practicing at the unit. Doctor Robertson was asked to complete a certificate attesting to the fact that appellant was mentally ill and was a danger to herself and/or others. Following his conversation with appellees Nolley and Armstrong, Doctor Robertson personally observed appellant, who was then at some distance from his vantage point. However, Doctor Robertson did not actually conduct a physical or psychiatric examination of appellant at that time. Following his observation of appellant, Doctor Robertson signed a physician's certificate, which, in part, reads as follows:

I, Phillip B. Robertson, do certify and state as follows:

(1) I have personally observed and examined Ruth Riffe on this date, which is the 2nd day of Jan., 1992, at 3:30 o'clock, pm, at Princeton Community Hospital, West Virginia. . . .

(2) I find the patient to be mentally ill. . . .

(3) I further find the patient to likely to cause harm to himself or others. . . .

(4) Based on this finding:

(a) I recommend the following treatment: Involuntary Commitment ASAP for inpt. Psychiatric Treatment

(b) Does this course of treatment require immediate hospitalization? Yes. . . .

The certificate also contained specific anecdotal facts and specific diagnoses supporting the conclusions just quoted.

pitalization for examination of an individual when said person has reason to believe that:
```
* * * * * *
```
(2) The individual is mentally ill or mentally retarded and, because of his mental illness or

The petition for involuntary commitment, made upon the oath of appellee Nolley, was filed in the Circuit Court of Mercer County with Doctor Robertson's certificate. In reliance on the petition, the court entered an order directing "that the Sheriff of Mercer County, West Virginia, apprehend the [appellant] and take her to Southern Highlands Community Mental Health Center (SHCMHC) or a facility designated by them for an immediate examination." The order directed that "if the Respondent is medically certified a probable cause hearing shall be held forthwith following said examination before a Court Mental Hygiene Commissioner or Magistrate at a place designated by said official." The order also directed that counsel be appointed for appellant. It appears that the court acted under the authority of W.Va.Code § 27-5-2(b)(4) (1983), which, in pertinent part, stated:

(4) The circuit court . . . may thereupon enter an order for the individual named in such action to be detained and taken into custody, for the purpose of holding a probable cause hearing described in subdivision (5) of this subsection and for the purpose of an examination of the individual by a physician or a psychologist. Such examination shall be provided or arranged by a community mental health center designated by the director of health to serve the county in which the action takes place. The said order shall specify that such hearing be held forthwith and shall appoint counsel for the individual: Provided, That where a physician or psychologist has performed such examination, the community mental health center may waive this requirement upon approving such examination.

Although appellant was to be taken into custody by the Sheriff under the provisions of the circuit court order and transported to Southern Highlands or a facility designated by it, appellant remained at the BMU, in the actual custody of the personnel there, and no evidence is before us that Southern was con-

mental retardation, the individual is likely to cause serious harm to himself or others if allowed to remain at liberty while awaiting an examination and certification by a physician or psychologist.

tacted or that it designated the BMU as the place for examination. Instead, the prosecuting attorney, representing the State, counsel appointed to represent appellant, and the mental hygiene commissioner were contacted and came to the BMU for the conduct of a probable cause hearing.

In the course of preparing for the hearing, it was learned that the certificate signed by Doctor Robertson was not based on a personal examination of appellant. After some discussion, the attorneys and the commissioner agreed that Doctor Robertson would proceed to examine appellant to determine anew if she was mentally ill and a danger to herself or others. Doctor Robertson proceeded to conduct a psychiatric examination of appellant and wrote a progress note reflecting his findings. On that occasion Doctor Robertson concluded:

> Altho pt. is clearly mentally ill at this time as noted above, she does not appear to be an immediate danger to self or others. She has calmed considerably since the initial assessment by several BMC clinicians around 2:00 pm today. Recommend that petition for Involuntary Commitment be dropped on the condition that a reliable family member assumes responsibility for the patient this evening and will take her home. Psychiatric treatment is recommended.

Doctor Robertson's progress note was made available to the attorneys and the commissioner. Appellant's counsel requested that appellant be released. The mental hygiene commissioner, David Harmon, denied the motion and proceeded to conduct a probable cause hearing, even though the circuit court order required that appellant be "medically certified" prior to a probable cause hearing. It cannot be ascertained from the record whether Doctor Robertson's earlier certification, based on his observation but not his examination of appellant, was thought to fulfill the requirement in the order of the

court below that appellant be "medically certified" before a probable cause hearing was to be held, or whether it was thought that Doctor Robertson's original certification justified waiving the "medically certified" requirement under the authority of the statutory procedure contained in W.Va.Code § 27–5–2(b)(4), as quoted above. In any event, it appears that the attorneys and the mental hygiene commissioner were fully advised of the circumstances under which the original certificate was prepared and considered and were fully advised of Doctor Robertson's subsequent change of opinion, reflected by his progress note.

Appellant was present at the hearing in person and by counsel. Doctor Robertson was not called to testify. Rather, the parties stipulated that the doctor's testimony would be consistent with his progress note. Following the taking of evidence, the commissioner ruled that probable cause existed to believe that appellant was "likely to injure himself/herself or others because of mental illness" and signed an order so stating. At a deposition taken later in this action, the commissioner testified that his finding at the probable cause hearing was based on appellant's demeanor and manner during her testimony and was not based on Doctor Robertsons's original signed statement.

Under W.Va.Code § 27–5–2(b)(5) (1983)[2], the order signed by the mental hygiene commissioner contains no direction that a person for whom probable cause is found be held or otherwise restrained. That authority arises under the provisions of W.Va.Code § 27–5–3(a) (1979), which provides for admission to a mental health facility following a probable cause hearing, and W.Va.Code § 27–5–10 (1974), which authorizes the Sheriff to provide transportation to an appropriate mental health facility when the need arises. The authority for admission to a mental health facility arises only upon compliance with both

---

**2.** West Virginia Code § 27–5–2(b)(5) (1983), in pertinent part, gave the following additional directions for a probable cause hearing:

> (5) A probable cause hearing shall be held before ... the mental hygiene commissioner ... of the county of which the individual is a resident or where he was found....

> ... At the conclusion of the hearing the ... mental hygiene commissioner ... shall find and enter an order stating whether or not there is probable cause to believe that such individual as result of mental illness, mental retardation or addiction is likely to cause serious harm to himself or others.

prongs of W.Va.Code § 27-5-3(a) (1979), which reads as follows:

(a) *Admission to a mental health facility for examination.*—Any individual may be admitted to a mental health facility for examination upon entry of an order finding probable cause ... and upon certification by one physician or one psychologist that he has examined the individual and that he is of the opinion the individual is mentally ill ... and because of his mental illness ... is likely to cause serious harm to himself or others if not immediately restrained....

After the probable cause hearing, appellant was held at the BMU while arrangements were made to transport her to a mental health facility. At some time following the probable cause hearing, appellee Nolley telephoned Beckley Appalachian Regional Hospital (BAR–H) to ascertain that a bed was available and also assembled a packet of documents, including the original involuntary commitment petition, Doctor Robertson's original sworn certificate, the probable cause finding, and an "Application For Transportation", signed by appellee Nolley, in which she certified herself as being qualified to make such an application to the Sheriff of Mercer County. The packet of documents also contained a handwritten note to BAR–H, which explained the absence of medical records for appellant but did not mention Doctor Robertson's progress note stating his revised opinion. Appellee Nolley testified that she tried to locate the progress note to include in the packet, but that it could not be found.

Appellant was put in restraints and transported to BAR–H by a Mercer County deputy sheriff, pursuant to the written request of appellee Nolley. The packet of documents was taken to BAR–H with appellant. Although the record is not clear on this point, it appears that BAR–H was a "mental health facility" within the meaning of the statute. BAR–H admitted appellant, having received in the packet sent with appellant evidence of compliance with both requirements for admission, i.e., the mental hygiene commissioner's finding of probable cause and Doctor Robertson's original, inaccurate certificate of a personal examination of appellant. Following the admission of appellant to BAR–H, her counsel filed a *habeas corpus* petition with the circuit court, seeking appellant's release because her detention at BAR–H was unlawful. The petition was heard January 6, 1992, and the writ of *habeas corpus* was granted. Appellant was immediately released from the Beckley facility.

Thereafter, appellant filed this action seeking money damages and alleging medical malpractice by Doctor Robertson, false imprisonment, and the intentional infliction of emotional distress or the tort of outrage. Doctor Robertson filed a motion for summary judgment, which was granted by order entered June 28, 1994, on the ground that it had not been shown that Doctor Robertson's acts or omissions were the proximate cause of the injuries of which appellant complained. Appellant apparently took no further action with respect to Doctor Robertson's summary judgment, except to file this appeal on March 29, 1995.[3] The remaining appellees filed motions for summary judgment, which were granted by order entered August 1, 1994. Appellant filed a motion on August 5, 1994, seeking relief from the summary judgments entered August 1, 1994, which was denied by order entered November 29, 1994. Appellant then filed this appeal from that order of denial on March 29, 1995.

## JURISDICTION TO HEAR THE APPEAL

■ Appellees urge us to dismiss this appeal as improvidently granted. They assert that this Court is without jurisdiction to hear the appeal because appellant sought relief from the summary judgments granted by an order entered below on August 1, 1994, and that the motion for relief is in the nature of a

---

**3.** As noted, Dr. Robertson's motion for summary judgment was granted June 28, 1994. That judgment did not conclude the case below. No motion for relief from that judgment was filed within ten days of its entry. The order granting that summary judgment does not contain "an express determination that there is no just reason for delay" and "an express direction for the entry of judgment", as permitted by Rule 54(b), W.Va. R.Civ.Proc., which provides guidance for dismissal of fewer than all parties or fewer than all claims.

motion authorized by Rule 60(b) of the West Virginia Rules of Civil Procedure. They further claim that the period for appeal is not tolled by a Rule 60(b) motion, but runs from the date of the entry of the order from which relief was sought, in this case, August 1, 1994, and that this appeal was not filed in the circuit court until March 29, 1995, more than four months after the entry of summary judgments addressed by appellant's motion. Doctor Robertson joins in the assertions of the other appellees in regard to this appeal being untimely. Doctor Robertson does appear to concede that, if this appeal is timely, the entry of summary judgment in his favor on June 28, 1994, was not a final order precluding its review as a part of this appeal. We will review the applicable rules to ascertain whether we have jurisdiction here.

■ First, we agree that a Rule 60(b) [4] motion does not toll the running of the time for appeal. Syl. pt. 2, *Gaines v. Drainer,* 169 W.Va. 547, 289 S.E.2d 184 (1982) (per curiam); Syl. pt. 1, *Toler v. Shelton,* 157 W.Va. 778, 204 S.E.2d 85 (1974); Rule 72, W.Va. R.Civ.Proc. We note, however, that appellant filed her motion for relief from the summary judgments entered August 1, 1994, on August 5, 1994, within ten days of the entry of judgment. We have held that a motion denominated a motion to "reconsider", "vacate", "set aside" or "reargue" is a Rule 59(e) [5] motion if filed and served within ten days of the entry of judgment. Syl. pt. 2, *Powderidge Unit Owners Association v. Highland Properties, Ltd.,* 196 W.Va. 692, 474 S.E.2d 872 (1996); *Savage v. Booth,* 196 W.Va. 65,

468 S.E.2d 318 (1996); Syl. pt. 5, *James M.B. v. Carolyn M.,* 193 W.Va. 289, 456 S.E.2d 16 (1995); Syl. pt. 1, *Lieving v. Hadley,* 188 W.Va. 197, 423 S.E.2d 600 (1992).

■ Appellant's August 5, 1994 motion asked the court below to "reconsider" the ruling entered August 1, 1994, and, therefore, being filed and served within ten days of that judgment, is to be treated as a Rule 59(e) motion. A Rule 59(e) motion is the proper motion by which a summary judgment may be timely attacked. *See James M.B. v. Carolyn M.,* 193 W.Va. 289, 456 S.E.2d 16 (1995). Moreover, Rule 59 motions suspend the running of the time for appeal, and that time does not begin to run until the entry of an order deciding the issues raised by the motion. Syl. pt. 7, *James M.B. v. Carolyn M.* 193 W.Va. 289, 456 S.E.2d 16 (1995); Rule 72, W.Va.R.Civ.Proc.; Syl. pt. 4, *McCormick v. Allstate Insurance Co.,* 194 W.Va. 82, 459 S.E.2d 359 (1995); *Mooney v. Barton,* 155 W.Va. 329, 184 S.E.2d 322 (1971). .

The order denying appellant's August 5, 1994 motion, here treated as a Rule 59(e) motion, was not entered until November 29, 1994. The appeal was filed March 29, 1995, within—if only barely—the four-month period ordinarily allowed for appeals to this Court. W.Va.Code § 58-5-4 (1990). Accordingly, this Court clearly has jurisdiction to hear this appeal and has before it for consideration both the summary judgments rendered August 1, 1994, and the order denying relief from those judgments, entered November 29, 1994.

---

4. Rule 60(b) of the West Virginia Rules of Civil Procedure, in pertinent part, states:

(b) *Mistakes; inadvertence; excusable neglect; unavoidable cause; newly discovered evidence; fraud, etc.*—On motion *and upon such terms as are just,* the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons: (1) Mistake, inadvertence, surprise, excusable neglect, or unavoidable cause; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed

or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time, and for reasons (1), (2), (3), and (6) not more than eight months after the judgment, order, or proceeding was entered or taken. A motion under this subdivision (b) does not affect the finality of a judgment or suspend its operation.... (Emphasis added.)

5. Rule 59(e) of the West Virginia Rules of Civil Procedure states:

(e) *Motion to alter or amend a judgment.*—A motion to alter or amend the judgment shall be served not later than 10 days after entry of the judgment.

The early summary judgment in favor of Doctor Robertson presents additional questions. Although Doctor Robertson concedes the issue, some of our cases produce doubt. We have held, on the one hand, that the presence or absence of the language set out in Rule 54(b)[6] to give finality to an order dismissing fewer than all parties or claims determines whether such a partial dismissal of parties or claims is indeed a final order with respect to the parties or claims dismissed. Syl. pt. 3, *Smith v. Buege,* 182 W.Va. 204, 387 S.E.2d 109 (1989); *Wheeling Dollar Savings and Trust Co. v. Singer,* 162 W.Va. 502, 250 S.E.2d 369 (1978); Syllabus, *Wilcher v. Riverton Coal Co.,* 156 W.Va. 501, 194 S.E.2d 660 (1973); *State ex rel. Bank of Ripley v. Thompson,* 149 W.Va. 183, 139 S.E.2d 267 (1964). On the other hand, we have held that the absence of the language required in Rule 54(b) will not be a bar to finality if this Court can determine that finality was intended. Syl. pt. 1, *Sisson v. Seneca Mental Health/Mental Retardation Council, Inc.,* 185 W.Va. 33, 404 S.E.2d 425 (1991), (quoting Syl. pt. 2, *Durm v. Heck's, Inc.,* 184 W.Va. 562, 401 S.E.2d 908 (1991)); *Taylor v. Miller,* 162 W.Va. 265, 249 S.E.2d 191 (1978). We have also said that if we can determine that finality was intended, although not expressly stated in the words of Rule 54(b), then, although the order is immediately appealable upon its entry, appeal need not be taken, but may be taken at any time until the jurisdictional period established by the entry of the last order terminating the entire action expires. *Eblin v. Coldwell Banker Residential Affiliates,* 193 W.Va. 215, 455 S.E.2d 774 (1995) (per curiam). Lastly, we have suggested, on the one hand, that if an appeal is taken from what is indeed the last order disposing of the last of all claims as to the last of all parties, then the appeal brings with it all prior orders. Syl. pt. 5, *State ex rel. Davis v. Iman Mining Co.,* 144 W.Va. 46, 106 S.E.2d 97 (1958) (quoting syl. pt. 2, *Lloyd v. Kyle,* 26 W.Va. 534 (1885)); *Harper v. South Penn Oil Co.,* 77 W.Va. 294, 87 S.E. 483 (1915); *Kelner v. Cowden,* 60 W.Va. 600, 55 S.E. 649 (1906); *Stout v. Philippi Manufacturing and Mercantile Co.,* 41 W.Va. 339, 23 S.E. 571 (1895); *Watson v. Wigginton,* 28 W.Va. 533 (1886); *Steenrod v. Railroad Co.,* 25 W.Va. 133 (1884); *Camden v. Haymond,* 9 W.Va. 680 (1876).

■ On the other hand, we have said that if a Rule 59(e) motion addresses only some claims, but not all, then the time for appeal is extended only for the claims addressed by the Rule 59(e) motion. Syl. pt. 4, *Kentucky Fried Chicken of Morgantown, Inc. v. Sellaro,* 158 W.Va. 708, 214 S.E.2d 823 (1975) (quoting syl. pt. 6, *Dixon v. American Indus. Leasing Co.,* 157 W.Va. 735, 205 S.E.2d 4 (1974)). All of these rules have been developed within the general rubric that an appellate court ought to usually have before it all of the controversy that was brought to the court below. *Cf. Gooch v. W.Va. Dept. of Public Safety,* 195 W.Va. 357, 465 S.E.2d 628 (1995) (quoting *United States v. Hollywood Motor Car Co., Inc.,* 458 U.S. 263, 102 S.Ct. 3081, 73 L.Ed.2d 754 (1982)) (rule of finality is to prohibit piecemeal appellate review of trial court decisions which do not terminate the litigation); *Wilcher v. Riverton Coal Co.,* 156 W.Va. 501, 194 S.E.2d 660 (1973) (this Court will not decide cases piecemeal).

■ It is appropriate to now reconcile these cases as best as we can, recognizing that we also have said that our practice may properly depart from the federal practice because, as a court of discretionary jurisdiction, we may later hear an appeal that earlier

**6.** Rule 54(b) of the West Virginia Rules of Civil Procedure states:

(b) *Judgment upon multiple claims or involving multiple parties.*—When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment. In the absence of such determination and direction, any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.

we declined to hear. *Durm v. Heck's, Inc.,,* 184 W.Va. 562, 401 S.E.2d 908 (1991); *Parsons v. Consolidated Gas Supply Corp.,* 163 W.Va. 464, 256 S.E.2d 758 (1979). In discussing these issues, we note that we do not address or disturb the requirements of Rule 59(a)[7] regarding motions for new trial and the requirement for such a motion upon the trial of a case if an appeal is to be taken. *State v. Bragg,* 140 W.Va. 585, 87 S.E.2d 689 (1955). Nor will we answer finally, and we again "leave for another day just what limits we place on Rule 54(b) where there is no express certification by the circuit court and the continuing vitality of our trilogy of cases ([*State ex rel.] McGraw [v. Scott Runyan Pontiac–Buick, Inc.,* 194 W.Va. 770, 461 S.E.2d 516 (1995)], *Sisson,* and *Durm* )", as reserved in *Province v. Province,* 196 W.Va. 473, 473 S.E.2d 894 (1996). However, to give some guidance on the issues left in flux by the array of cases cited, we hold:

■ 1. In an order dismissing fewer than all of the parties or fewer than all the claims in a civil action, the inclusion of the language required by Rule 54(b) of the West Virginia Rules of Civil Procedure makes that order appealable immediately with respect to the dismissed parties and claims.

■ 2. Upon the appeal of an order summarily dismissing fewer than all of the parties or fewer than all the claims in a civil action, the trial court's decision to include the language required by Rule 54(b) for finality will be reviewed under an abuse of discretion standard. 10 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 2655 at 43 (1983).

■ 3. Upon the appeal of a final order dismissing fewer than all of the parties or fewer than all the claims in a civil action, this Court, on the motion of any party or *sua sponte,* may elect to defer consideration of

the appeal until an appeal is taken from the order terminating the entire action or the time for the appeal of the terminating order expires.

■ 4. Whether an order dismissing fewer than all of the parties or fewer than all the claims in a civil action, which does not contain the express determinations set forth in Rule 54(b) of the West Virginia Rules of Civil Procedure, was intended to be final and is therefore appealable before the entire action is terminated will be determined by this Court from all the circumstances and the terms of the order. The better practice for the circuit courts to follow is to expressly state or negate their intentions with respect to the finality of such an order within the body of the order.

■ 5. An order dismissing fewer than all of the parties or fewer than all the claims in a civil action which contains a determination by a circuit court that the order *not* be considered final will be reviewed by this Court only upon application for a writ of prohibition. The party seeking such a writ must show any such abuse clearly and convincingly, because this Court greatly favors having before it all matters in controversy when reviewing the issues raised before it.

■ 6. " 'Where an appeal is properly obtained from an appealable decree either final or interlocutory, such appeal will bring with it for review all preceding non-appealable decrees or orders, from which have arisen any of the errors complained of in the decree appealed from, no matter how long they may have been rendered before the appeal was taken.' Point 2, syllabus, *Lloyd v. Kyle,* 26 W.Va. 534 [1885]." Syl. pt. 5, *State ex rel. Davis v. Iman Mining Co.,* 144 W.Va. 46, 106 S.E.2d 97 (1958).

■ 7. "A motion for reconsideration filed within ten days of judgment being en-

---

7. Rule 59(a) of the West Virginia Rules of Civil Procedure states:

(a) *Grounds.*—A new trial may be granted to all or any of the parties and on all or part of the issues (1) in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law; and (2) in an action tried without a jury, for any of the reasons for which

rehearings have heretofore been granted in suits in equity. On a motion for a new trial in an action tried without a jury, the court may open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new findings and conclusions, and direct the entry of a new judgment.

tered suspends the finality of the judgment and makes the judgment unripe for appeal. When the time for appeal is so extended, its full length begins to run from the date of entry of the order disposing of the motion." Syl. pt. 7, *James M.B. v. Carolyn M.*, 193 W.Va. 289, 456 S.E.2d 16 (1995).

8. An appeal may be taken from a final order disposing of a motion under Rule 59(e) of the West Virginia Rules of Civil Procedure at any time within the appeal period provided by the entry of the order, or within any proper extension of the appeal period.

In accord with these guidelines, the order granting summary judgment to Doctor Robertson is brought here before us by the appeal of the order granting summary judgment to the other appellees, since the appeal here was filed within the appeal period provided by the entry of the final order denying appellant's Rule 59(e) motion with respect to the summary judgment granted the other appellees.

## SCOPE OF REVIEW

The controlling issue in this appeal is whether the trial court appropriately granted summary judgment to appellees. "A circuit court's entry of summary judgment is reviewed *de novo*." Syl. pt. 1, *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994). Summary judgment is proper under Rule 56(c) of the West Virginia Rules of Civil Procedure where the moving party shows there is no genuine issue as to any material fact and that he or she is entitled to judgment as a matter of law. The standard for granting summary judgment is stated as follows: " ' "A motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." Syllabus Point 3, *Aetna Casualty & Surety Co. v. Federal Insurance Co. of New York*, 148 W.Va. 160, 133 S.E.2d 770 (1963).' Syllabus Point 1, *Andrick v. Town of Buckhannon*, 187 W.Va. 706, 421 S.E.2d 247 (1992)." Syl. pt. 2, *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994).

In determining on review whether there is a genuine issue of material fact between the parties, this Court will construe the facts in a light most favorable to the losing party. *Alpine Property Owners Association, Inc. v. Mountaintop Development Co.*, 179 W.Va. 12, 365 S.E.2d 57 (1987). "A party who moves for summary judgment has the burden of showing that there is no genuine issue of fact and any doubt as to the existence of such issue is resolved against the movant for such judgment." Syl. pt. 6, *Aetna Casualty & Surety Co. v. Federal Insurance Co. of New York*, 148 W.Va. 160, 133 S.E.2d 770 (1963).

## APPELLEES' RELATIONSHIP

As we understand the record, only Doctor Robertson and the employees or agents of Springhaven, Inc., were actively involved in the facts giving rise to this appeal. The involvement of Princeton Community Hospital, under the pleadings before us, appears to be wholly passive. As a consequence, appellee Princeton Community Hospital appears to have only such derivative liability in this matter as may be created by its status as a contracting party with Doctor Robertson or Springhaven, Inc., and the operation of the BMU by Springhaven as an integral part of the hospital, with Doctor Robertson on staff. Likewise, any liability of Springhaven, Inc., appears to arise out of the actions of its employees, appellees Armstrong and Nolley, its operation of the BMU, and any relationship it may have with Doctor Robertson. We, therefore, treat any liability of Princeton Community Hospital as being wholly derivative from the actions of Doctor Robertson or Springhaven, Inc., and the liability of Springhaven as arising from its relationships with the other appellees. Any such liability is treated, in turn, as dependent upon the proof ultimately adduced and legal principles relied upon to establish any such derivative liability. For convenience, we will hereafter collectively refer to all of the appellees other than Doctor Robertson as the "Springhaven appellees".

## FALSE IMPRISONMENT ISSUES

Appellant argues that summary judgment in favor of the Springhaven appellees on her

claim of false imprisonment was inappropriate. Her contentions can be summarized in four points: (1) That her detention for two hours while the involuntary commitment petition was being processed is not justifiable restraint and is actionable; (2) that the probable cause hearing, being unlawful, provides appellees no protection and is not *res judicata* as to her mental condition at the time; (3) that once Doctor Robertson reversed his judgment and prepared his progress note, the remaining appellees are liable for her continued detention and transfer to BAR–H under physical restraints; and (4) that the mental hygiene commissioner did not order her further detention at the conclusion of the probable cause hearing, and the Springhaven appellees had no authority to cause her further detention, physical restraint, transportation, and admission to BAR–H.

The Springhaven appellees respond that their initial detention of appellant was clearly justified by the statutory plan for involuntary commitments and judicial process, that appellant's initial detention was justified to enable the judicial process to commence, that the probable cause determination justified appellant's continued detention in good faith compliance with judicial orders, and that the Springhaven appellees enjoy quasi-judicial immunity for their efforts to give effect to the decision of the mental hygiene commissioner. The Springhaven appellees contend that their initial detention of appellant was justified by her upset condition and that the finding in the probable cause hearing—that by reason of mental illness appellant was a danger to herself or others—forecloses further inquiry into the propriety of her detention after that time.

▇▇▇ We turn first to a review of authorities on false imprisonment. This Court has said that the gist of the action for false imprisonment is illegal detention of a person without lawful process or by an unlawful execution of such process. *Vorholt v. Vorholt*, 111 W.Va. 196, 160 S.E. 916 (1931); *Finney v. Zingale*, 82 W.Va. 422, 95 S.E. 1046 (1918). In *Vorholt*, a lunacy proceeding was brought in Kanawha County. Under the procedure then in place, the defendant procured a warrant for the arrest of the plaintiff

for the purpose of having the "lunacy commission" inquire into the sanity of the plaintiff. The plaintiff was arrested, and a hearing was held. The plaintiff was released when he was determined sane by the commission. Thereafter, he brought an action alleging both false imprisonment and malicious prosecution, the latter count alleging that the defendant had a malicious purpose in procuring the warrant and arrest of the plaintiff. This Court affirmed the dismissal below of the false imprisonment count, because the arrest and detention occurred pursuant to lawful process, but reversed the dismissal of a malicious prosecution count otherwise properly pleaded, since it averred that the procuring of the warrant and arrest was achieved for a malicious purpose. In its opinion, the Court adopted the following definition of the distinction between the two actions:

> "An action for false imprisonment may be maintained where the imprisonment is without legal authority. But, where there is a valid or apparently valid power to arrest, the remedy is by an action for malicious prosecution. The want of lawful authority is an essential element in an action for false imprisonment. Malice and want of probable cause are the essentials in an action for malicious prosecution."

*Vorholt v. Vorholt*, 111 W.Va. at 199, 160 S.E. at 918 (citing *Roberts v. Thomas*, 135 Ky. 63, 121 S.W. 961, 962 (1909)).

However, not every order or warrant for arrest, even though apparently valid on its face, will insulate those who instigate the issuance of the warrant from an action for false imprisonment resulting from the execution of the warrant. In *Ogg v. Murdock*, 25 W.Va. 139 (1884), a defendant's lawyer procured a warrant for the arrest of a debtor. The warrant was regular on its face and was issued under the authority of a statute authorizing the arrest of a debtor under certain circumstances. The defendant was held liable for false imprisonment when it was shown that, although the statute authorized the issuance of the warrant, there was no suit pending against the debtor at the time the warrant was issued, and, in the absence of a pending suit, the statute did not operate to

authorize the issuance of the warrant. Also, in *Williamson v. Glen Alum Coal Co.*, 72 W.Va. 288, 78 S.E. 94 (1913), a coal company which arrested and procured the trial of a man for a "misdemeanor", for conduct which did not constitute any crime, was held liable for false imprisonment resulting from the arrest and the trial, even though the judicial officer, a justice of the peace, who conducted the trial, was a duly constituted public officer entitled to arrest and try accused persons for a misdemeanor without a warrant. More recently, in *Winters v. Campbell*, 148 W.Va. 710, 137 S.E.2d 188 (1964), a party who instigated an arrest under a "Mary Doe" warrant issued by a justice of the peace that did not contain a legally sufficient description of the alleged defendant was held liable for false imprisonment.

■ With the principles enunciated in these cases in mind, we look first to the claim of the Springhaven appellees that their early detention of appellant, from the time of her arrival at the BMU, was justified. The evidence available in the record suggests that, upon arrival at the BMU, appellant was extremely upset and that appellees feared for her safety and were even concerned that she might do harm to others in the psychiatric unit. We note that there is no material dispute of the facts regarding appellant's apparent state of mind and general condition when she arrived at the BMU, and we regard the few divergences in the testimony before us as inconsequential. In those circumstances, the doctrine of justification is applicable. The common law has long provided justification for the temporary and reasonable restraints of insane persons, even without legal proceedings, when they are dangerous to themselves or others. 32 Am.Jur.2d *False Imprisonment* § 72 (1995). Accordingly, the early detention of appellant, to protect her from harm and prevent harm to others and to prepare, properly document, and file a petition for involuntary commitment, can be seen as acts taken in good faith and for good reason, all fully justified in law.

Difficulty arises at the point where the Springhaven appellees Armstrong and Nolley proceeded to inform Doctor Robertson of the situation and take from him a certificate representing that Doctor Robertson had examined appellant. The Springhaven appellees contend that since everything they did from that time to the time of appellant's release from BAR–H under a writ of *habeas corpus* was done in aid of the involuntary commitment procedure set forth by statute, they are immune from damages as acting in a quasi-judicial capacity. They rely on the filing of the initial petition for involuntary commitment, the issuance by the circuit court of its order directing the Sheriff of Mercer County to take appellant into custody, the probable cause hearing, and the finding by the mental hygiene commissioner of probable cause to believe that appellant was likely to harm herself or others by reason of mental illness.

To address the issues thus raised, we must consider the law of quasi-judicial immunity or privilege in relation to involuntary commitment proceedings. Our discussion will necessarily touch on the potential liability of Doctor Robertson to the charge of negligence under another count in appellant's complaint below. We will discuss that count more fully later in this opinion, noting here only that appellant did not charge Doctor Robertson under the false imprisonment count.

The defense of quasi-judicial immunity has been described as follows:

> An exemption similar to that of judges from personal liability for their judicial acts is extended to officers in the other departments of government whenever they are entrusted with the exercise of discretionary power and their determinations or decisions are, by their nature judicial.... This immunity exists only where the officer has jurisdiction of the particular case and is authorized to determine it; if the officer transcends the limits of authority the officer ceases, in the particular case, to act as judge, and is responsible for all the consequences....

32 Am.Jur.2d *False Imprisonment* § 109 (1995) (footnotes omitted).

There is a view, suggested by the cases collected by R.F. Chase, Annotation, *Liability for False Imprisonment Predicated Upon Institution of, or Conduct in Connection with, Insanity Proceedings*, 30 A.L.R 3d 523,

536 (1970 & Supp.), that "[e]xamining physicians who testify or otherwise give evidence in proceedings to determine sanity [are] ... immune from liability for false imprisonment ..." and applying that principle even where the physician failed to follow statutory directions or made false statements. The cases supporting that view appear to rest on the theory that, as necessary participants in the commitment procedure, the physicians are judicial officers and are therefore immune.

In a few cases cited and others decided more recently, that view has been applied in cases involving a failure to follow statutory directions. Without exhaustively reviewing those cases, we touch on three. In *Hurley v. Towne,* 155 Me. 433, 156 A.2d 377 (1959), the physician, as in this case, falsely certified without in fact examining the plaintiff. The court upheld immunity for the physician, although it is noted that the actual incarceration occurred on an order entered by the hearing tribunal. In *Niven v. Boland,* 177 Mass. 11, 58 N.E. 282 (1900), the court reached the same result, emphasizing the quasi-judicial nature of the physician's certificate, even though it was false. In *Carter v. Landy,* 163 Ga.App. 509, 295 S.E.2d 177 (1982), the statute required a physician's *examination,* but the physician merely "observed" the person. On the facts of that case, the court affirmed the grant of summary judgment in favor of the doctor in a false imprisonment case, saying that the issue presented was to be determined on medical standards, not legal ones. In *Williams v. Smith,* 179 Ga.App. 712, 348 S.E.2d 50 (1986), the Georgia court overruled the "medical standards" test, saying:

> [T]o the extent that *Carter v. Landy,* supra, could be construed as establishing *a medical negligence standard* for determining the "unlawfulness" of an involuntary detention pursuant to OCGA § 37–3–40 et seq., it must be overruled. We hold the following to be the applicable legal principles: Where one is taken into custody pursuant to a procedurally *valid* certificate of a physician authorizing involuntary mental treatment, the resulting detention is not "unlawful." Although such detention may give rise to other claims, a cause of

action for false imprisonment is not among them. Where one is held in custody pursuant to a *void or defective* physician's certificate, there is a viable claim for false imprisonment, but only if the certificate was not issued in "good faith." Where ... the detention is not evidenced by some form of objective compliance by the physician with all applicable procedural process requirements, there is a viable claim for false imprisonment.

*Id.* at 716, 348 S.E.2d at 54 (emphasis in original).

*Williams v. Smith,* with its reliance on good faith, appears to be in accord with the more modern view expressed in 32 Am. Jur.2d, *False Imprisonment* § 115 (1995), where a distinction is drawn between cases in which a physician has falsely certified that an examination has been conducted and cases where the examination is faulty or inadequate. The emerging general rule seems to suggest that all such cases turn on their respective merits and that recovery can be had on a false certificate but will usually be denied on the basis of immunity or privilege grounds where the examination is simply faulty or inadequate. In *McLean v. Sale,* 38 N.C.App. 520, 248 S.E.2d 372 (1978), a summary judgment in favor of the physician was reversed and the cause remanded for trial in a false imprisonment case. The court said a material issue of fact existed as to whether the doctor intentionally or negligently violated his duty to make an examination before signing a certificate of commitment and that any such violation is not covered by immunity. In *Sukeforth v. Thegen,* 256 A.2d 162 (Me.1969), the court held squarely that a certification that a physician has made an examination in a mental hygiene proceeding, when none has been made, is false imprisonment. However, the court recited that observation in lieu of examination would meet the statutory requirement, where the condition and actions of the ill person prevented a full fledged examination. A similar result obtained in *Delatte v. Genovese,* 228 So.2d 252 (La.App.1969). *Fair Oaks Hospital v. Pocrass,* 266 N.J.Super. 140, 628 A.2d 829 (1993), confronts the issue of immunity for physician misconduct in a case where the

commitment statute was not followed but no false certificate was employed to restrain the allegedly ill person. In *Fair Oaks*, a physician transported the allegedly mentally ill person to a mental health facility. Under a recently enacted applicable statute, such a person had either to be first taken to a screening service or two physicians' certificates had to be presented and a court order obtained. The patient was not taken to the screening service but was admitted to a mental health facility on the say so of this doctor, who furnished one certificate, but the second certificate and the order were not obtained until after admission was achieved. It appears that under the prior statute the procedure employed would have been appropriate. The court said that the failure to follow the statutory procedure presented an issue of negligence for the jury. The court reasoned that, while the doctor was charged with knowledge of the new procedure, the jury might not find negligence because the doctor was familiar with the old statute. However, the court also ruled that the physician was liable to the patient for false imprisonment because motive was not an issue, the elements in false imprisonment being the intent to imprison and the absence of lawful process.

Although we find no West Virginia cases dealing specifically with the employment of false medical certificates that fail to comport with statutory requirements for involuntary commitments, we believe that the cases reviewed which permit a finding of liability where the certificate is false are directly consistent with the principles enunciated in the West Virginia false imprisonment cases we reviewed in this opinion. As the Court stated in *Williamson v. Glen Alum Coal Co.*, *supra*, the elements of false imprisonment are (1) the detention of the person, and (2) the unlawfulness of the detention and restraint. And, as suggested in *Vorholt, supra*, an action may be sustained on the unlawful execution of otherwise lawful process, and neither malice nor want of probable cause are elements the plaintiff must prove to prevail in the action. *See Johnson v. Norfolk & Western Railway Co.*, 82 W.Va. 692, 97 S.E. 189 (1918). Moreover, the detention and restraint may be shown to be unlawful, as in *Ogg v. Murdock* and *Winters v. Campbell*, even though the detention is carried out under facially valid authority or, as in *Williamson v. Glen Alum Coal Co.*, with the assistance of validly constituted authority, acting beyond this authority. We, therefore, conclude that the defense of quasi-judicial immunity or privilege is generally available to one participating in the involuntary commitment process in good faith. However, the defense of quasi-judicial immunity or privilege does not apply where it is shown: (1) that a materially false medical certificate was employed to effect or continue the detention of the plaintiff, (2) that such false medical certificate was necessary to the continued detention of the plaintiff, and (3) that the person made and employed the false medical certificate, or (4) employed such certificate knowing or having reason to know that it was materially false.

In the case before us, the Springhaven appellees, as well as Doctor Robertson, knew or clearly should have known that the medical certificate originally signed by Doctor Robertson contained the representation that he had examined the appellant and knew or should have known that that representation was false. That representation appears to be not only material, but crucial, to executing the temporary involuntary commitment procedure employed against appellant. Under the evidence thus far developed, it may be concluded that the employment of that certificate at various stages in the events giving rise to this action, in the particular circumstances of this case, resulted in the detention of appellant from the time of the making of the certificate to the time appellant was released from BAR–H. The evidence, it appears, will also support the conclusion that the Springhaven appellees caused or participated in causing that detention and that the false medical certificate was crucial to the continued detention of appellant at several distinct stages in the detention process. We will proceed to review particular circumstances that bear, to a greater or lesser extent, on the matter at issue.

Appellees are not in fact officers of the government but would enjoy limited immunity or privilege because of the delicate nature of involuntary commitment and mental health problems, in which their faithful participation is critical and welcome. Nevertheless, the right to detain another must be exercised with due regard to the provisions of law permitting it and faithful compliance with legal requirements. When reviewing a motion for summary judgment, we, like the court below, must examine the pleadings, depositions, and admissions on file, together with the affidavits, if any, to determine if there is a genuine issue as to any material fact. In doing so, we view the evidence available in the light most favorable to the non-moving party and must decide whether the moving party is entitled to judgment as a matter of law. If there is a genuine issue for trial, the judgment sought will not be rendered. *See Painter v. Peavy,* 192 W.Va. 189, 451 S.E.2d 755 (1994). We now review the circumstances appearing in this case under those standards, leaving for a jury the actual determination of the facts.

**Preparing and filing the involuntary commitment petition.** Appellant's evidence would support a finding that appellees Robertson, Armstrong, and Nolley, and by derivation appellee Springhaven, fully participated in obtaining Doctor Robertson's original medical certificate and that the certificate was known from the beginning to be false and misleading. As discussed above, that set off a chain of events resulting in appellant's continued detention.

**Detention after the court order, pending the probable cause hearing.** The circuit court's order in the involuntary commitment proceeding, issued after appellee Nolley completed her petition and caused it to be presented to the court, authorized appellant's detention by the Sheriff of Mercer County. The evidence suggested by the record before us is that, after the issuance of the circuit court order, the Springhaven appellees, rather than the Sheriff, detained appellant at the BMU while arrangements were being made for a probable cause hearing.

Further, in an apparent effort to provide for medical certification and full compliance with the requirements for temporary involuntary commitment, the order of the circuit court required that appellant be examined at Southern Highlands Community Mental Health Center or a facility designated by it. Alternatively, the statute upon which appellees rely authorized the use of an examination done elsewhere, if the examination was approved by Southern Highlands. The record does not indicate that the BMU was designated by Southern Highlands to conduct the examination and does not indicate that any other examination of appellant approved by Southern was ever conducted. In short, it may be concluded, relying on the false medical certificate alone, that appellees made no effort to obtain a valid, approved medical examination conforming to the requirements of the circuit court order.

Finally, it is noted that the circuit court order further provided for a probable cause hearing if—and only if—the appellant was "medically certified". The evidence would support a conclusion that the Springhaven appellees, having made no effort to comply with the precise terms of the circuit court order or to provide the substitute approved examination allowed by statute, next caused the probable cause hearing to be convened, with the prosecuting attorney, appellant's appointed counsel and the mental hygiene commissioner coming to the BMU for that purpose. All that time, it may be concluded, appellant remained unlawfully detained at the BMU, in the custody of Springhaven, not the Sheriff.

**The probable cause hearing.** Appellees contend that, in any event, the finding of the commissioner in the probable cause hearing justified the continued detention of appellant. They suggest that the commissioner's finding absolves them of liability because appellant was indeed found to be mentally ill and likely to harm herself or others. It is noted that the commissioner made that finding based on his own observation and not on Doctor Robertson's original certificate or subsequent progress note.

However, it appears that the probable cause hearing was not authorized in law, there apparently being no valid examination and medical certificate as required by the

circuit court order and the applicable statute. Moreover, the commissioner's order, standing alone, makes no reference to continued detention of the appellant and provides no authority to hold and restrain her. In a properly conducted mental hygiene proceeding, appellees would necessarily have had before them a physician's or psychologist's certificate which they reasonably believed constituted an "examination" meeting the statutory requirements. Here, a fair, reasonable inference can be drawn that the Springhaven appellees knew or should have known otherwise. The existence of a finding of probable cause validly made by the mental hygiene commissioner can be seen in these circumstances to be more or less irrelevant. The finding of probable cause serves one office, the physician's certificate serves another, and the employment by the Springhaven appellees of a false physician's certificate perpetuated the appellant's confinement.

An inference may also be drawn that the Springhaven appellees disregarded the changed opinion of Doctor Robertson, and, in cooperation with the attorneys and mental hygiene commissioner, facilitated an unlawful probable cause hearing. We believe that a jury could properly conclude that appellant's detention throughout the probable cause hearing occurred because of the Springhaven appellees' employment of the false medical certificate and their failure to comply or, in some instances, even attempt to comply with statutory requirements.

**Appellant's transportation and admission to BAR–H.** Doubt may be raised as to the authority of the Springhaven authorities to arrange for the transportation of appellant to BAR–H. To be sure, there is a mimeographed form, signed by appellee Nolley, requesting that the Sheriff transport appellant to BAR–H. We assume that the form was one frequently used in commitment cases. It may be concluded that the use of the form simply evidences the continued detention of appellant under appellee's asserted authority, rather than the authority of law. As noted before, we do not find in the record that the Sheriff of Mercer County ever had custody of appellant under the order of the circuit court directing the Sheriff to take

appellant into custody. It is reasonable to infer that the Sheriff, in transporting appellant to BAR–H, did not act under the authority of the circuit court order. One may conclude that the Sheriff took custody of appellant only after the probable cause hearing under the purported authority conferred by the request for transportation executed by appellee Nolley, supported by the finding of probable cause by the mental hygiene commissioner and the original certificate signed by Doctor Robertson. Again, the Springhaven appellees are implicated by such inferences.

The admission of appellant to BAR–H can also be seen to flow from the employment of the false certificate. The evidence is that Springhaven sent along to BAR–H Doctor Robertson's original certificate, facially sufficient to gain appellant's admission to BAR–H, and a handwritten note explaining the absence of medical records for appellant. The record discloses that Springhaven appellees claim that at that time, Doctor Robertson's later progress report had been misplaced or lost, though effort was made to locate it and send it along to BAR–H with appellant. We note, however, that it appears that no specific mention of Doctor Robertson's progress note, or that it had been misplaced or lost, was contained in the handwritten note to BAR–H explaining the absence of medical records. Moreover, appellee Nolley called BAR–H to be certain a bed was available but apparently did not advise BAR–H that the progress note had been misplaced or lost or that it negated in large measure the findings appearing on the face of Doctor Robertson's original certificate. Lastly, we note, for what bearing it might have, that the record does not disclose that BAR–H is a "mental health facility" authorized by statute to receive a person involuntarily committed if all the legal requirements are met. We believe that adverse inferences, contrary to the assertions of appellees, may properly be drawn from these factors.

We note again that the lawful temporary commitment of an allegedly mentally ill person to a mental health facility under the provisions of W.Va.Code § 27–5–1, *et seq.*, may only occur when two steps have

been accomplished: (1) a facially valid certificate of an examining physician or psychologist exists expressing the judgment that such person is mentally ill and likely to harm himself or herself or others, and (2) a facially valid finding of probable cause has been made to the same effect. In short, the medical or psychological discipline and the legal discipline must concur in the judgment. In our procedure, there is no confirming court order made expressly committing the allegedly mentally ill person to the mental health facility. It may be concluded that appellant's admission to and incarceration at BAR–H flowed directly from the employment by the Springhaven appellees of the original medical certificate, knowing or having reason to know it to be false.

■ **Summary.** We conclude that a jury, on proper instruction of the elements of false imprisonment, could conclude that Springhaven possessed no legal authority to detain appellant, at least from the time the Sheriff was first ordered to apprehend appellant. The jury may also conclude that Springhaven, through its employees, intentionally falsely imprisoned appellant at any time from and after the original Robertson certificate was solicited until she was released from BAR–H. In the light most favorable to appellant, the evidence thus far developed supports the conclusion that appellant simply was not a candidate for a probable cause hearing or for admission to a mental health facility and that the legal procedure which the Springhaven employees attempted to employ to gain her admission there, seen in that light, was simply not applicable to her circumstances. Under such an analysis, the Springhaven appellees are liable to appellant for such damages as the evidence may show and a jury may find. As regards the claim of immunity or privilege, we are persuaded by that line of cases which grants immunity or privilege to those necessary participants in the temporary commitment process, even in the event of simple error, but denies immunity or privilege with respect to the natural consequences of the making and employment of a materially false certificate that an allegedly mentally ill person has been examined, when in fact no such examination occurred, because a facially valid certificate of that type is a critical requirement for commitment. Appellant is entitled to prove her case, to show to what extent the Springhaven appellees employed such a certificate to restrain her freedom, knowing or having reason to know it was false, and to have such recovery therefor as the law and the evidence permit in cases of false imprisonment.

## DOCTOR ROBERTSON'S SUMMARY JUDGMENT

■ Appellant claims that it was error to grant summary judgment to Doctor Robertson on the ground that Doctor Robertson's alleged malpractice was not a proximate cause of her injuries. She claims there had been sufficient evidence developed to place the issue before the jury. Doctor Robertson responds that appellant has failed to show that his conduct, if negligent, was the proximate cause of appellant's injury because the mental hygiene commissioner did not rely on Doctor Robertson's opinions in finding probable cause and appellant's confinements proceeded from the finding of probable cause on other factors not involving Doctor Robertson. We find that the question of proximate cause in this claim presents a jury issue and, accordingly, reverse the summary judgment in favor of Doctor Robertson.

■ First, we apply to the negligence count against Doctor Robertson the rule applied to the other appellees that although the defense of quasi-judicial immunity or privilege is generally available to one participating in the involuntary commitment process in good faith, it is not available in the defense of a negligence charge to one who makes and employs or knowingly employs a materially false medical certificate.

■ We move to the consideration of the basis upon which the summary judgment was granted, the asserted lack of proximate cause. In considering whether an event is a proximate cause of the injury, the bellweather test is foreseeability. If the injury occurring could have been reasonably foreseen to flow from a negligent act or omission, absent an intervening cause, then that negligent act or omission may well be the proximate cause of the injuries. *Thrasher v. Amere Gas Util-*

*ities Co.,* 138 W.Va. 166, 75 S.E.2d 376 (1953), *appeal dismissed,* 347 U.S. 910, 74 S.Ct. 478, 98 L.Ed. 1067 (1954); *Fields v. Director General of Railroads,* 86 W.Va. 707, 104 S.E. 767 (1920); *Donald v. Long Branch Coal Co.,* 86 W.Va. 249, 103 S.E. 55 (1920).

Here, it may be forcefully argued that the making of the medical certificate, representing falsely that appellant had been examined by Doctor Robertson, could easily have been foreseen to result in the initiation of an involuntary commitment proceeding, appellant's apprehension for a probable cause hearing, and appellant's subsequent restraint, transportation to, and admission to BAR–H, against her will. Doctor Robertson is a psychiatrist, practicing in a mental health unit, who was consulted by appellees Armstrong and Nolley about obtaining a certificate for use in an involuntary commitment proceeding. Doctor Robertson's particular expertise in the matter of mental hygiene matters is strongly suggested by the record.

Moreover, we note that the order filing the involuntary commitment petition expressly required that a probable cause hearing only be held if appellant was "medically certified." In addition, W.Va.Code § 27–5–3(a) authorizes the admission of appellant to a mental health facility only upon certification of the patient by a physician or psychologist. One might well reasonably infer from the evidence that neither the probable cause hearing nor the admission to BAR–H could have occurred but for Doctor Robertson's original medical certificate and that he could reasonably be expected to fully appreciate the significance of his certificate. The filing of the petition for involuntary commitment, the holding of appellant for a probable cause hearing, the hearing, and the subsequent incarceration of appellant at BAR–H could be reasonably foreseen as flowing naturally from the making and delivery of Doctor Robertson's certificate.

■ It can be argued that Doctor Robertson could not have foreseen that the mental hygiene commissioner would proceed with a hearing after receiving the doctor's progress note expressing opinions contrary to those expressed in the original certificate, and it could also be argued that it could not have been foreseen that appellant would be taken to BAR–H without both of Doctor Robertson's expressed opinions.[8] However, we cannot say, as a matter of law and on the record before us, that either of these events rise to the level of a new effective cause, which, operating independently of Doctor Robertson's failure to make an examination, became the sole proximate cause of appellant's alleged injury. *See Costoplos v. Piedmont Aviation, Inc.,* 184 W.Va. 72, 399 S.E.2d 654 (1990) (per curiam); *Evans v. Farmer,* 148 W.Va. 142, 133 S.E.2d 710 (1963); *Smith v. Penn Line Service, Inc.,* 145 W.Va. 1, 113 S.E.2d 505 (1960); *Hartley v. Crede,* 140 W.Va. 133, 82 S.E.2d 672 (1954); *Wilson v. Edwards,* 138 W.Va. 613, 77 S.E.2d 164 (1953). " 'One who has committed a breach of duty is liable for its natural and proximate effects, which may be immediate or through the subsequent media of natural forces or other innocent causes.' Point 1, Syllabus, *Mills v. Indemnity Insurance Company of North America,* 114 W.Va. 263 [171 S.E. 532]." Syl. pt. 7, *Frye v. McCrory Stores Corporation,* 144 W.Va. 123, 107 S.E.2d 378 (1959). Suffice it to say that summary judgment in Doctor Robertson's favor for lack of proximate cause was, at best, premature and inappropriate.

■ We believe that the jury, under proper instruction, may conclude that Doctor Robertson's negligence was the proximate cause of appellant's alleged injuries, from the time of her detention after his original certificate was prepared until her release. The jury may also be called upon to consider the assertion that later actions by the mental hygiene commissioner or the Springhaven appellees, or both, constitute a supervening or intervening cause, relieving him of liability for the events occurring thereafter. We have defined an intervening cause as follows:

---

**8.** It appears that alleged medical malpractice in the preparation for and processing of involuntary commitment cases has been recognized as a cause of action separate from a claim of false imprisonment in such cases. *See* 32 Am.Jur.2d *False Imprisonment* § 115 (1995); R.F. Chase, Annotation, *Liability for False Imprisonment Predicated upon Institution of, or Conduct in Connection with, Insanity Proceedings,* 30 A.L.R.3d 523, 553 (1970).

" ' "An intervening cause, in order to relieve a person charged with negligence in connection with an injury, must be a negligent act, or omission, which constitutes a new effective cause and operates independently of any other act, making it and it only, the proximate cause of the injury." Syllabus Point 16, *Lester v. Rose*, 147 W.Va. 575, 130 S.E.2d 80 (1963) [*modified on other grounds, State ex rel. Sutton v. Spillers*, 181 W.Va. 376, 382 S.E.2d 570 (1989) ].' Syllabus Point 1, *Perry v. Melton*, 171 W.Va. 397, 299 S.E.2d 8 (1982)."

Syl. pt. 3, *Wehner v. Weinstein*, 191 W.Va. 149, 444 S.E.2d 27 (1994).

 We do not decide that Doctor Robertson would be entitled to an instruction invoking the defense of intervening cause but leave the matter for further consideration by the trial court when the evidence is in. We do note that this Court has spoken, in a somewhat different context, about the concept of the duty to act where one's affirmative conduct has raised the possibility of harm to another:

One who engages in affirmative conduct, and thereafter realizes or should realize that such conduct has created an unreasonable risk of harm to another, is under a duty to exercise reasonable care to prevent the threatened harm.

Syl. pt. 2, *Robertson v. LeMaster*, 171 W.Va. 607, 301 S.E.2d 563 (1983).

In *Robertson*, the Court further noted that in determining the scope of the duty, the foreseeability of the risk being considered is an important consideration. 171 W.Va. 607, at 610–11, 301 S.E.2d 563, at 567, cited with approval in *Miller v. Whitworth*, 193 W.Va. 262, 455 S.E.2d 821 (1995). Here, there is little doubt that Doctor Robertson's original certificate set in motion the chain of events that culminated in appellant's confinement at BAR–H. When Doctor Robertson set out to correct his original statement, he did so by way of a progress note but did not recall or reclaim possession of his original certificate. That original certificate played a role in the subsequent events, right up to the time of appellant's release under a writ of *habeas corpus*. That reality clearly connects all of those subsequent events to the original certificate. One conclusion fairly drawn from the present record is that Doctor Robertson's conduct is a proximate cause of any subsequent injury to appellant. However, it may be concluded that, at some stage in the process, other causes intervened so as to end Doctor Robertson's responsibility for events subsequent to that point. We leave that for the court below and, if appropriate, the jury to resolve.

## TORT OF OUTRAGE

 The tort of intentional infliction of emotional distress or outrage has been defined by this Court as follows: " 'One who by extreme or outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for bodily harm.' Syllabus pt. 6, *Harless v. First National Bank in Fairmont*, 169 W.Va. 673, 289 S.E.2d 692 (1982)." Syl. pt. 1, *Dzinglski v. Weirton Steel Corporation*, 191 W.Va. 278, 445 S.E.2d 219 (1994). We have recognized that the tort of outrage is subject to the defense of qualified privilege, which we defined as follows: "A defendant's conduct is subject to a qualified privilege when he acts to protect or advance his own legitimate interests, the legitimate interests of other or the legitimate interests of the public." Syl. pt. 5, *Dzinglski v. Weirton Steel Corporation, supra*. We have also recognized that damages awarded in such cases, where there is no proof of physical trauma, are essentially punitive damages, and thus, further punitive damages in addition to those assessed as compensatory are not to be awarded, but the award of compensatory damages in such cases serves the same policy of deterrence underlying the allowance of punitive damages. *Dzinglski v. Weirton Steel Corporation, supra*. As we understand the record, appellant was placed in physical restraints for her transportation to BAR–H. We do not know what, if any, physical harm that may have caused and are likewise unadvised as to whether appellant's incarceration at BAR–H was uneventful in terms of whether any physical trauma occurred there. On the record before us, it is difficult to find sufficient

facts to support the claim of outrage, as we have limited and defined it in the recent cases cited above. Likewise, it is very doubtful that further discovery and even trial will develop sufficient evidence for this claim to go to the jury. But, given the state of the record on the claim of false imprisonment and the necessity of further development of the record on that claim, we cannot say, as a matter of law, that the claim of intentional infliction of emotional distress was properly dismissed below.

## CONCLUSION

We conclude that there remain unresolved material questions of fact that preclude a summary judgment. We further conclude that the issues of Doctor Robertson's negligence and the issue of proximate cause are for the jury, as is the matter of false imprisonment, assuming the evidence we have reviewed is admitted. Likewise, the evidence regarding the tort of outrage may be further developed. The summary judgments granted below were improper, and we, therefore, reverse and remand this cause for further proceedings consistent with this opinion.

Reversed and remanded.

WORKMAN, Justice, dissenting,

Because the majority appears to eliminate the good faith exception to a claim for false imprisonment arising from a void or defective physician's certificate, I must respectfully dissent. The law in this area is accurately stated in *Williams v. Smith,* 179 Ga.App. 712, 348 S.E.2d 50 (1986), an opinion relied on by the majority.

> Where one is taken into custody pursuant to a procedurally *valid* certificate of a physician authorizing involuntary mental treatment, the resulting detention is not "unlawful." Although such detention may give rise to other claims, a cause of action for false imprisonment is not among them. Where one is held in custody pursuant to a *void or defective* physician's certificate, there is a viable claim for false imprison-

ment, but only if the certificate was not issued in "good faith."

*Id.* 348 S.E.2d at 54.

Under the *Williams* standard, a physician [1] who executes a certificate for involuntary commitment that is later determined to be void or defective is liable only if the certificate was not issued in good faith. 348 S.E.2d at 54. While the facts of the instant case may not be the equivalent of those instances when a full-fledged examination is not possible due to the individual's mental and physical state, nonetheless, there are foreseeable instances when a full psychiatric examination may not be possible prior to the circuit court's issuance of an order permitting the individual to be taken into custody for the purpose of holding a probable cause hearing. *See* W. Va.Code § 27-5-2(b)(4). In such instances, it would not appear fair to the physician to hold him or her liable for false imprisonment in the event the individual is ultimately determined not to need psychiatric treatment unless the physician issued the certificate in bad faith. Yet, the majority's distinction that allows recovery when an examination has been falsely certified, but not when the examination has been faulty or inadequate, does not appear to include this critical defense of good faith. Indeed, the majority seems to obscure the importance of such defense.

The majority goes further askew in applying the facts of this case to the law. Under the *Williams* decision, properly applied, the second category—that of a void or defective physician's certificate—is what seems to have occurred in this case. The Appellant turns her claim for false imprisonment on the language within the physician's certificate that states that Dr. Robertson "ha[s] personally observed and examined Ruth Riffe." Because the physician's admitted examination of Appellant at the time the certificate was issued was limited to his observations of her from the nurse's station, the Appellant argues that his statement within the certificate that he "examined" her was false. Given that the definition of a mental status examination is generally stated in terms of "objec-

---

1. Presumably, the standard would extend to individuals in addition to the physician whose alleged liability arises from the issuance of the physician's certificate.

tive observations of the subject's appearance and manner of presentation[,]" I would disagree with the conclusion reached by the majority that the physician's certificate was false because of the lack of a complete examination. M. Binder, *Psychiatry in the Everyday Practice of Law* § 3.3 (3rd ed.1992). While Dr. Robertson's examination was limited to his observations of Appellant, nonetheless, I would still conclude that an examination, within the accepted psychiatric meaning of that term, occurred.

I further part ways with the majority's analysis because all of the procedural protections at the heart of statutory procedures governing involuntary commitment were followed. It was not a procedurally invalid physician's certificate that caused Appellant to be committed, but rather an arguably defective or void certificate, under the *Williams* standard, due to the lack of an actual examination. Since the procedural steps for obtaining involuntary commitment were followed to the letter, this case should be analyzed under the majority's own two-pronged standard as a faulty or inadequate examination case.[2] As the majority clearly states, quasi-judicial immunity should be extended in such cases. Only if the faulty or inadequate examination was performed in bad faith should quasi-judicial immunity not be extended to those necessary participants in the commitment procedure. Otherwise, as observed by the Princeton Community Hospital Association, "[e]ntities and individuals providing health care to the public will no[ ] longer be willing to risk the liability associated with initiating the involuntary commitment process."

The irony of this case is that the Appellees were trying to help this woman. When she, in rapid succession, threatened both homicide and suicide; jerked the hospital's phone out of the wall; kicked the door and otherwise acted out in a rather dramatic and threatening fashion, what were the personnel in the behavioral medicine unit to do? While they could have had the Appellant arrested, they were clearly trying to act humanely and at the same time, to select the appropriate ther-

apeutic solution for the Appellant's own best interests.

I wish to further point out that even under the majority's theory, the defense of justification that the Appellees raised below remains a valid defense on remand. Under this common law theory, provided Appellees acted in good faith to protect Appellant from harming herself or others in connection with restraining Appellant and instituting the involuntary commitment proceedings, their actions may be viewed as justified.

Much unnecessary confusion results from the approach taken by the majority. For instance, the majority loosely employs the terms "false" and "falsely certified." What the majority is referring to as "false" is the use of the term "examined" on the physician's certificate without an accompanying full examination. As explained above, I depart from the conclusion shared by the majority that a full examination is necessarily required. Notwithstanding this difference, however, it still appears improper to refer to the instant case as one in which the certificate is false when it is not the certificate about which the majority truly complains, but the nonexistence of a full examination. Moreover, upon analysis, the two categories that the majority creates for purposes of analysis—falsely certified or faulty or inadequate examination—appear to be one and the same.

Lastly, I find the majority opinion rambling and difficult to understand. The result created is one of those cases that gives the judicial system a reputation for having no common sense whatsoever. Mental health professionals out in the real world know the kinds of aggravated mental distress human beings get into, especially in family settings. They, as helping professionals, are frequently called upon for help and intervention. They will probably be much more cautious in the future in trying to help people.

---

2. While I do not believe that the examination conducted by Dr. Robertson was indeed inadequate for purposes of determining whether involuntary commitment procedures should be initiated due to his opportunity to observe Appellant's mental state, I nonetheless proceed to discuss this case in terms of faulty or inadequate examination for purposes of this dissent.